Bobby ADLER, William Anderson, Randall Baker, David Beranek, Jeffrey Bergstrom, Ralph Conger, Harry Greenwell, Terry Hacker, Kent Helble, Jim Ishmael, John Jones, Michael Kulish, Gary Kupferschmidt, Robert Lang, David Marin, Jerry Martens, Dan McCarthy, Drew Meyer, William Michuta, Robert Monigold, William Olsen, Mark Paulson, James Petty, Wayne Pine, David Reed, Steven Saale, Martin Shepard, Ronald Shimek, Michael Simon, Vincent Simonini, Michael Stansberry, Randy Sundquist, Steve Tarras, Patrick Whalen, Larry Yahn, and Edward Wojohn, Plaintiffs,

v.

I & M RAIL LINK, L.L.C., an Iowa company, and C.P. Rail, a/k/a Soo Line Railroad Co., a Minnesota corporation, Defendants.

No. C 97–3116–MWB.

United States District Court,
N.D. Iowa,
Central Division.

June 17, 1998.

Charles A. Collins, St. Paul, MN, Jim Arenson, Zimmerman, Miller & Arenson, Iowa city, IA, for Plaintiffs.

William C. Davidson, Jed E. Brokaw, Lane & Waterman, Davenport, IA, for Defendant I & M Rail Link.

Susan M. Robiner, Leonard, Street & Deinard, Minneapolis, MN, for Defendant C.P. Rail/Soo Line Railroad Co.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT I & M RAIL LINK'S MOTION TO DISMISS AND DEFENDANT C.P. RAIL/SOO LINE RAILROAD'S MOTION FOR JUDGMENT ON THE PLEADINGS AND TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

BENNETT, District Judge.

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................ 915
 A. Factual Background ............................................. 915
 B. Procedural Background ......................................... 916
· II. LEGAL ANALYSIS .................................................. 917
 A. Applicable Standards .......................................... 917
 B. The RLA Claim ................................................ 919
 1. RLA provisions and causes of action ..................... 919
 2. Availability of the cause of action to job applicants ... 921
 3. Does Nelson preclude the Track Workers' RLA claim? ...... 922
 a. "Transfer" employees ................................ 922
 b. Conspiracy to violate the RLA ....................... 923
 c. "Per se" violations by Soo Line ..................... 924
 d. "Successor" liability for RLA violations ........... 924
 C. The FELA Claim ............................................... 927
 1. The purpose and scope of the FELA ...................... 928
 2. Does the FELA authorize a cause of action for retaliation against a claimant? ................................................ 929
 3. Does Iowa public policy authorize the cause of action? .. 932
 4. The relief available ................................... 932
 5. Can "applicants" assert a FELA retaliation claim? ...... 933
 D. The ADA Claim ................................................ 933
 1. Pre–employment inquiries concerning disabilities ........ 934
 2. Does § 12112(d) authorize a cause of action for improper inquiries? ... 935
 3. Pleading of disability and perceived disability ........ 937
 E. Civil Conspiracy ............................................. 939
 1. Civil conspiracy under Iowa law ......................... 939
 2. Can a state-law civil conspiracy claim be based on an alleged violation of federal law? ........................................... 941

III. CONCLUSION ....................................................... 944

In an attempt to derail some of the plaintiffs' claims before they ever leave the station, the defendant railroads have moved to dismiss or for judgment on the pleadings for failure to state a claim or lack of subject matter jurisdiction. The challenged claims assert anti-union animus in violation of the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*, discrimination and retaliation for filing claims under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.*, prohibited inquiries and discrimination in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and civil conspiracy to violate each of these federal acts and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, arising from the failure of one of the defendant railroads to rehire the plaintiff track maintenance workers when it purchased

eleven hundred miles of track from the other defendant railroad, re-employed all managers and most track maintenance workers, and allegedly assumed all contracts and obligations of the predecessor. The court must consider not only the adequacy of the pleading of such claims, but their availability to persons in the circumstances of the plaintiffs.

## I. INTRODUCTION

### A. Factual Background

As this matter comes before the court on motions to dismiss and for judgment on the pleadings, the factual background for the present ruling is based upon the allegations of the complaint, which are taken as true. *See, e.g., Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The plaintiffs, all railroad track workers (the Track Workers), were employed by defendant C.P. Rail, a/k/a Soo Line Railroad Company (Soo Line), until May or June of 1997.[1]

---

1. The Track Workers allege that Soo Line is a Minnesota corporation and a wholly-owned subsidiary of C.P. Rail, a Canadian corporation. Soo Line admits most of these allegations in its answer, but asserts that Soo Line is a wholly-owned subsidiary of Canadian Pacific Railway, a Canadian corporation.

The complaint alleges that the Track Workers average forty-three years of age and fourteen years of experience and that all were qualified for and were performing their job duties with Soo Line. However, they were not rehired by defendant I & M Rail Link, L.L.C. (I & M), when I & M bought approximately 1100 miles of Soo Line's track on April 5, 1997, even though I & M did rehire the majority of Soo Line's managers and employees previously responsible for maintaining that section of track. According to the complaint, I & M's purchase included, *inter alia*, all of Soo Line's physical facilities, including track from Winona, Minnesota, to Kansas City, Missouri, buildings, equipment, tools, cars, locomotives, and all of Soo Line's contracts and business obligations. The Track Workers allege that "I & M is a successor business entity to and, in the context of the facts of this case, is the alter ego of the Soo Line." Complaint, ¶ 23.[2]

The Track Workers allege that I & M and Soo Line (collectively the Railroads) reached an agreement for the purchase of the track and employment of Soo Line's employees in November of 1996, although I & M was not incorporated until February 28, 1997, and did not begin operating as a common carrier until April 5, 1997, when its purchase of Soo Line's track was consummated. In December of 1996, I & M announced its intention to retain all managers of Soo Line in the areas purchased and to retain all qualified maintenance-of-way employees. I & M requested employment applications from all non-management workers on or about November 25, 1996, and interviewed applicants in December of 1996 and January of 1997. In those interviews, the Track Workers allege that they were asked whether they had any physical problems or disabilities; whether they had been injured on the job while working for Soo Line; whether they had made any claims for any on-the-job injuries at Soo Line; and whether they had filed any union claims or grievances while employed at Soo Line. Following the interviews, on May 30, 1997, and June 2, 1997, I & M refused to hired any of the plaintiffs, except Yahn and Petty, who were later disqualified without cause.

The Track Workers allege that, prior to the interviews and continuing until I & M made its hiring decisions, Soo Line managers impermissibly provided information to I & M concerning each plaintiff's employment history, including information about the Track Workers' union activities—such as activism, leadership, strike support, and claim filings—medical condition and work-related injuries, claims for work-related injuries, and disabilities. The Track Workers allege that Soo Line managers then participated in I & M's hiring decisions, and that those decisions were motivated at least in part by an intent to retaliate or discriminate against the Track Workers for union activities, disabilities, or injury claims.

### B. Procedural Background

The Track Workers filed their complaint in this lawsuit on November 26, 1997, and a first amended and substituted complaint on February 26, 1998. In the amended complaint, the Track Workers assert seven causes of action: (1) violation of the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*, by conspiring to and actually denying them employment based in whole or in part on their participation in protected union activities; (2) violation of the express and implied provisions of the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.*, and regulations of the Federal Railroad Administration (FRA), 49 C.F.R. § 225 *et seq.*, which purportedly prohibit retaliation or discrimination based on reporting or filing claims for work-related injuries on the railroad; (3) violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, by denying the plaintiffs reemployment because of disabilities or perceived disabilities within the meaning of the ADA; (4) age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*; (5) conspiracy in violation of 42 U.S.C. § 1985(3) to violate the plaintiffs' rights under the RLA, FELA, FRA, ADA, and ADEA; (6) a state-law civil conspiracy to violate the same federal rights; and (7) intentional interference with prospective contractual opportunities, apparently by Soo

**2.** Soo Line denies that I & M's purchase included all contracts and business obligations of Soo Line

and denies that I & M is the successor to Soo Line.

Line, which deprived the Track Workers of the opportunity to work for I & M in their home areas.

Instead of answering the complaint, I & M moved to dismiss the RLA, FELA, ADA, and § 1985(3) claims on April 9, 1998. Although Soo Line answered the amended complaint on April 8, 1998, on May 13, 1998, Soo Line moved for judgment on the pleadings on the Track Workers' RLA, § 1985(3), and state-law civil conspiracy claims, and to dismiss the Track Workers' FELA claim for lack of subject matter jurisdiction. The Track Workers resisted the Railroads' motions on June 5, 1998. However, in that resistance, the Track Workers concede that § 1985(3) generally does not apply to economic wrongs and requires a pervasive racial scheme; therefore, they have voluntarily dismissed that claim. Thus, the present ruling addresses the adequacy of the Track Workers' RLA, FELA, ADA, and state-law civil conspiracy claims.

The court heard oral arguments on the motions on June 10, 1998. The plaintiff Track Workers were represented by counsel Charles A. Collins of St. Paul, Minnesota, and Jim Arenson of Zimmerman, Miller & Arenson in Iowa City, Iowa. Defendant I & M Rail Link was represented by counsel William C. Davidson and Jed E. Brokaw of Lane & Waterman in Davenport, Iowa. Defendant C.P. Rail/Soo Line Railroad Co. was represented by counsel Susan M. Robiner of Leonard, Street & Deinard in Minneapolis, Minnesota. The court will consider the arguments of counsel, both written and oral, in its legal analysis after first detailing the standards applicable to the Railroads' motions.

## II. LEGAL ANALYSIS

### A. *Applicable Standards*

I & M has moved to dismiss the Track Workers' RLA, FELA, and ADA claims, pre-answer, for failure to state a claim, pursuant to FED. R. CIV. P. 12(b)(6). After answering, Soo Line has moved for judgment on the pleadings on the Track Workers' RLA, ADA, and civil conspiracy claims pursuant to FED. R. CIV. P. 12(c), and to dismiss the Track Workers' FELA claim for lack of subject matter jurisdiction, pursuant to FED. R. CIV. P. 12(b)(1). Thus, the court must begin by identifying the standards applicable to the

Railroads' motions. The court finds that, in the circumstances of this case, there is little practical difference among the applicable standards.

A motion to dismiss may be made, *inter alia*, for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Such motions "can serve a useful purpose in disposing of legal issues with the minimum of time and expense to the interested parties." *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 973 (8th Cir.1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969). The issue is not whether a plaintiff will ultimately prevail, but rather whether the plaintiff is entitled to offer evidence in support of its claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1376 (8th Cir.1989). In considering a motion to dismiss under Rule 12(b)(6), the court must assume that all facts alleged in the plaintiff's complaint are true, and must liberally construe those allegations. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Doe v. Norwest Bank Minn., N.A.*, 107 F.3d 1297, 1303–04 (8th Cir.1997) ("In considering a motion to dismiss, we assume all facts in the complaint are true, construe the complaint in the light most favorable to the plaintiff, and affirm the dismissal only if 'it appears beyond a doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief,'" quoting *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir.1994)); *WMX Techs., Inc. v. Gasconade County, Mo.*, 105 F.3d 1195, 1198 (8th Cir.1997) ("In considering a motion to dismiss, the court must construe the complaint liberally and assume all factual allegations to be true."); *First Commercial Trust v. Colt's Mfg. Co.*, 77 F.3d 1081, 1083 (8th Cir.1996) (same).

The court is mindful that in treating the factual allegations of a complaint as true pursuant to Rule 12(b)(6), the court must "reject conclusory allegations of law and unwarranted inferences." *Silver v. H & R Block, Inc.*, 105 F.3d 394, 397 (8th Cir.1997) (citing *In re Syntex Corp. Securities Lit.*, 95 F.3d 922, 926 (9th Cir.1996)); *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th

Cir.1990) (the court "do[es] not, however, blindly accept the legal conclusions drawn by the pleader from the facts," citing *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987), and 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 595–97 (1969)); *see also LRL Properties v. Portage Metro Hous. Auth.,* 55 F.3d 1097, 1103 (6th Cir.1995) (the court "need not accept as true legal conclusions or unwarranted factual inferences," quoting *Morgan,* 829 F.2d at 12). Conclusory allegations need not and will not be taken as true; rather, the court will consider whether the *facts* alleged in the complaint, accepted as true, are sufficient to state a claim upon which relief can be granted. *Silver,* 105 F.3d at 397; *Westcott,* 901 F.2d at 1488.

The United States Supreme Court and the Eighth Circuit Court of Appeals have both observed that "a court should grant the motion and dismiss the action 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Handeen v. Lemaire,* 112 F.3d 1339, 1347 (8th Cir.1997) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *accord Conley,* 355 U.S. at 45–46, 78 S.Ct. 99 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief."); *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 546 (8th Cir.1997) ("'A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,'" quoting *Fusco v. Xerox Corp.,* 676 F.2d 332, 334 (8th Cir.1982)); *Doe,* 107 F.3d at 1304 (dismissal is appropriate only if "'it appears beyond doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief,'" quoting *Coleman,* 40 F.3d at 258); *WMX Techs., Inc.,* 105 F.3d at 1198 ("Dismissal should not be granted unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts that would entitle relief," citing *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99). The Rule does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations. *Neitzke*

*v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). Thus, "[a] motion to dismiss should be granted as a practical matter only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey v. City of Herculaneum,* 44 F.3d 667, 671 (8th Cir.1995) (internal quotation marks and ellipses omitted); *accord Parnes,* 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim). Here, the Railroads contend that there is such an "insuperable bar" to relief on some of the Track Workers' claims.

On a motion for judgment on the pleadings pursuant to Rule 12(c), the court must also "accept as true the well-pleaded allegations in the complaint and draw all inferences therefrom in favor of the non-moving party." *Independent Fed'n of Flight Attendants v. Cooper,* 141 F.3d 900, 901–02 (8th Cir.1998) (citing FED. R. CIV. P. 12(c), and *Lion Oil Co. v. Tosco Corp.,* 90 F.3d 268, 270 (8th Cir. 1996)). A distinction between a Rule 12(b)(6) motion and a Rule 12(c) motion "is purely formal, because [the court must] review [a] 12(c) motion under the standard that governs 12(b)(6) motions." *Westcott,* 901 F.2d at 1488 (citing *St. Paul Ramsey County Med. Ctr. v. Pennington County,* 857 F.2d 1185, 1187 (8th Cir.1988), and *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 11 (6th Cir.1987)).

Although subject matter jurisdiction is a threshold issue for the court, which grants the district court "broader power to decide its own right to hear the case than it has when the merits of the case are reached," *Bellecourt v. United States,* 994 F.2d 427, 430 (8th Cir.1993) (quoting *Osborn v. United States,* 918 F.2d 724, 729 (8th Cir.1990), which in turn quotes *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981)), *cert. denied,* 510 U.S. 1109, 114 S.Ct. 1049, 127 L.Ed.2d 371 (1994), in the circumstances of this case, there is little difference between the standard applicable to the Railroads' Rule 12(b)(6) or 12(c) motions and Soo Line's Rule 12(b)(1) motion. This is so, because Soo Line makes a facial challenge to subject matter jurisdiction over the FELA

claim here, rather than mounting a factual challenge to the truthfulness of its averments. *See Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir.1993) (distinguishing between facial and factual challenges to subject matter jurisdiction). Soo Line asserts that the FELA simply does not provide for the cause of action asserted in the Track Workers' second claim.

The court in *Titus* explained a facial challenge to subject matter jurisdiction as follows:

> In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction. *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 731–32 (11th Cir. 1982)....

*Id.* Thus, for all of the present motions, the court must take the factual allegations as true, then see whether, as a matter of law, they are sufficient to state a claim upon which relief can be granted or to state a claim over which the court has subject matter jurisdiction.

## B. The RLA Claim

The Railroads challenge the adequacy of the Track Workers' first cause of action, which is a claim of "anti-union animus" pursuant to the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.* The Track Workers allege that the Railroads have violated the RLA by conspiring to and actually denying them employment based in whole or in part on their participation in protected union activities, such as filing time claims, testifying in grievance hearings, making safety complaints, organizing, and related union and member functions, including holding union offices.[3] The Track Workers assert that it is a *per se* violation of the RLA to ask whether an applicant has previously filed union claims, and that it is also a *per se* violation of the RLA for Soo Line officers to provide information about such union activities to I & M. They seek backpay and benefits, lost future income or placement at I & M, damages

for emotional distress, travel expenses, and other losses compensable at law.

I & M and Soo Line contend that this claim is inadequate as a matter of law, because the RLA does not apply to applicants for employment. Both Railroads rely on *Nelson v. Piedmont Aviation, Inc.*, 750 F.2d 1234 (4th Cir.1984), *cert. denied*, 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985). The Track Workers contend that they have not alleged anti-union animus simply in hiring decisions, which they acknowledge would fall outside the purview of the RLA, but retaliatory and discriminatory conduct by a predecessor corporation to purge its successor corporation of union activists and that the two entities thus acted in concert to do together what Soo Line was prohibited by the RLA from doing alone.

### 1. RLA provisions and causes of action

"The RLA provides a mechanism for resolving labor disputes involving common carriers in interstate commerce without disrupting the nation's transportation services." *Independent Fed'n of Flight Attendants v. Cooper*, 141 F.3d 900, 902–03 (8th Cir.1998); *accord Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) (Congress passed the Railway Labor Act "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes"); *Sheet Metal Workers' Int'l Ass'n v. Burlington Northern R.R. Co.*, 893 F.2d 199, 202 (8th Cir.1990) ("One purpose of the RLA is to prevent the disruption of the Nation's rail service by requiring unions and management to attempt to settle all contractual disputes and minor grievances using the procedures provided in the RLA."); *Landfried v. Terminal R.R. Ass'n of St. Louis*, 721 F.2d 254, 254 (8th Cir.1983) ("[T]he purpose of [the RLA] is to promote stability in labor-management relations in the national railroad industry."), *cert. denied*, 466 U.S. 928, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984). In the part of the act that is pertinent here, § 2 Third & Fourth, codified at 45 U.S.C.

---

3. Although it is not altogether clear from the amended complaint, this cause of action appears to be asserted only by plaintiffs Meyer, Shimek, Kulish, Martens, Bergstrom, Ishmael, Reed, Yahn, Petty, Tarras, and Saale, as only the union activities of these plaintiffs are detailed in the complaint. *See* Complaint, ¶¶ 48, 49, and 52.

§ 152 Third & Fourth, the RLA provides as follows:

**Third. Designation of representatives**

Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

**Fourth. Organization and collective bargaining; freedom from interference by carrier; assistance in organizing or maintaining organization by carrier forbidden; deduction of dues from wages forbidden**

Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions: *Provided,* That nothing in this chapter shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time, or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization.

45 U.S.C. § 152 Third & Fourth.

These subsections, part of the 1934 amendments to the RLA, have been "'viewed ... as addressing primarily the precertification rights and freedoms of unorganized employees.'" *Brotherhood of Locomotive Eng'rs v. Kansas City So. Ry. Co.,* 26 F.3d 787, 795 (8th Cir.) (quoting *Trans World Airlines, Inc. v. Independent Fed'n of Flight Attendants,* 489 U.S. 426, 440, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989)), *cert. denied,* 513 U.S. 930, 115 S.Ct. 320, 130 L.Ed.2d 281 (1994). Nonetheless, the Eighth Circuit Court of Appeals has held that causes of action are available under these subsections in post-certification as well as pre-certification situations. *Id.; accord Fennessy v. Southwest Airlines,* 91 F.3d 1359, 1363 (9th Cir.1996) ("'An implied right of action exists under [§ 152 Fourth],'" quoting *Arcamuzi v. Continental Air Lines, Inc.,* 819 F.2d 935, 936 (9th Cir. 1987)), *cert. denied,* —— U.S. ——, 117 S.Ct. 1692, 137 L.Ed.2d 819 (1997). Therefore, the Eighth Circuit Court of Appeals has recognized that a private cause of action will lie under either of these subsections if the complaining party presents "'adequate evidence that [the railroad's] actions have been motivated by anti-union animus or that [the railroad's] actions were an attempt to interfere with its employees' choice of their collective bargaining representative.'" *Id.* (quoting *Tello v. Soo Line R.R.,* 772 F.2d 458, 462 (8th Cir.1985), and also citing *National R.R. Passenger Corp. v. International Ass'n of Machinists & Aerospace Workers,* 915 F.2d 43, 51 (1st Cir.1990)). To put it another way, "[i]n situations ... know as 'post-certification' controversies, Section 2, Fourth has been interpreted as providing protection where the plaintiff can show that the employer's actions 'strike a fundamental blow to union or employer activity and the collective bargaining process itself.'" *Dempsey v. Atchison, Topeka & Santa Fe Ry. Co.,* 16 F.3d 832, 841 (7th Cir.) (quoting *Trans World*

*Airlines, Inc.,* 489 U.S. at 442, 109 S.Ct. 1225), *cert. denied,* 513 U.S. 821, 115 S.Ct. 82, 130 L.Ed.2d 35 (1994).

The Seventh Circuit Court of Appeals recently explained that a claim that anti-union animus motivated an employment decision is analyzed using the "same burden-shifting method employed in unlawful discharge claims brought under the National Labor Relations Act (NLRA)." *Lebow v. American Trans Air, Inc.,* 86 F.3d 661, 665–66 (7th Cir.1996). To establish such a claim under § 152 Fourth, an employee must demonstrate that (1) he or she " 'engaged in union ... activities; (2) the employer knew of the employee's involvement in protected activities; (3) the employer harbored animus toward those activities; and (4) there was a causal connection between the employer's animus and its discharge decision.' " *Id.* at 666 (quoting *Carry Cos. of Ill., Inc. v. NLRB,* 30 F.3d 922, 927 (7th Cir.1994)). Furthermore, "[a]n employee may prove his [or her] case using either direct or circumstantial evidence." *Id.*

### 2. Availability of the cause of action to job applicants

Although the Track Workers have alleged retaliatory or discriminatory acts motivated by anti-union animus that might otherwise be sufficient to sustain a cause of action under § 152 Third or Fourth, the Railroads contend that the Track Workers' RLA claim must be dismissed, because the RLA does not apply to applicants for jobs with a railroad, and the Track Workers were only applicants for jobs with I & M. The seminal case for this proposition, as the parties recognize, is *Nelson v. Piedmont Aviation, Inc.,* 750 F.2d 1234 (4th Cir.1984), *cert. denied,* 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985).

In *Nelson,* the Fourth Circuit Court of Appeals considered whether a replacement pilot who had flown for one airline during a strike could state a claim pursuant to § 152 Fourth when he was not later hired by another airline, allegedly because the other airline feared delays and maintenance problems if it hired a pilot who had flown for an airline during a strike. *Nelson,* 750 F.2d at 1236. The Fourth Circuit Court of Appeals' analy-

sis of the availability of such a claim was as follows:

Nothing in the statutory language or the legislative history of the RLA (which extends to common carriers by air, 45 U.S.C. § 181) supports appellant's contention that applicants for employment are covered. The purpose of the statute is to establish the mechanics for collective bargaining between interstate carriers and their employees through freely selected representatives of both parties, *Nashville, C. & St. L. Ry. v. Railway Employees Dept.,* 93 F.2d 340 (6th Cir.1937), *cert. denied,* 303 U.S. 649, 58 S.Ct. 746, 82 L.Ed. 1110 (1938); *see also Virginian Ry. Co. v. System Federation No. 40,* 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937). The statute defines an "employee" in clear language:

The term "employee" as used herein includes every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate in the orders of the Interstate Commerce Commission.... 45 U.S.C. § 151 Fifth (emphasis added).

In construing a statute, we must begin with the ordinary meaning of the words used and, absent a clearly expressed legislative intent to the contrary, regard the language as conclusive. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982); *see also United States v. American Trucking Ass'ns, Inc.,* 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). Here the statutory language does not admit of doubt. At the time of his application to Piedmont, appellant was not "in the service of a carrier" and did not "perform any work" for an airline as specified by 45 U.S.C. § 151 Fifth. *See Nashville, C. & St. L. Ry. v. Railway Employees Dept.,* 93 F.2d 340 (6th Cir.1937), *cert. denied,* 303 U.S. 649, 58 S.Ct. 746, 82 L.Ed. 1110 (1938). Therefore, appellant was plainly not subject to the protections of 45 U.S.C. § 152 Fourth, prohibiting an employer from interfering with an employee's free choice of whether or not to join a labor organization. The only section of the RLA that deals with

prospective employees is 45 U.S.C. § 152 Fifth, prohibiting a carrier from requiring a person seeking employment to sign any agreement promising to join or not to join a labor organization. The presence of this section demonstrates Congress' ability to cover prospective employees when it wishes, and appellant makes no claim that Piedmont attempted to extract any promises from him in violation of this provision.

There are 1,381 pages of legislative history pertaining to the Railway Labor Act and its several amendments. Not one considers the possibility of extending coverage to discrimination in the hiring of employees.

No case supports appellant's arguments....

*Nelson,* 750 F.2d at 1236. The court noted further that other statutes to which Nelson compared the RLA were inapposite, because

[t]he difference in wording between those statutes and the RLA makes clear the more limited nature of the latter's coverage. While the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.,* § 158(a) (1982), and the Federal Labor–Management and Employee Relations Act, 5 U.S.C. § 7101 *et seq.,* § 7116(a) (1982), protect prospective employees in their spheres of coverage, the RLA does not.

*Id.* at 1237.

This court can find no decision rejecting *Nelson*'s conclusion that the RLA does not protect prospective employees or applicants. Indeed, the Seventh Circuit Court of Appeals also specifically embraced the holding of *Nelson* in *Air Line Pilots Ass'n v. United Air Lines, Inc.,* 802 F.2d 886 (7th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987), holding that "trainees and applicants simply do not fall within the RLA's definition of employee." 802 F.2d at 913 (citing *Nelson,* 750 F.2d at 1234–36).

### 3. Does Nelson preclude the Track Workers' RLA claim?

#### a. "Transfer" employees

█ However, the lack of authority contrary to *Nelson* does not necessarily mean that *Nelson* precludes the Track Workers'

RLA claim here, even though the Track Workers, then employees of Soo Line, were "applicants" for employment with I & M. In *Pyles v. United Air Lines, Inc.,* 79 F.3d 1046 (11th Cir.1996), the Eleventh Circuit Court of Appeals considered whether "the statutory definition of employee means that the RLA applies when an employee of one [common carrier] has a dispute with another [common carrier]." *Pyles,* 79 F.3d at 1051. The court found that the employee in question, Pyles, was "clearly someone who performed services as an employee for 'a carrier'—Pan Am," but his dispute was over the failure of another airline, United, to hire him when United acquired certain aircraft, ground facilities, and routes from Pan Am and agreed to exercise its best efforts to hire Pan Am's flight crews from these aircraft and routes. *Id.* at 1048 & 1051. The court concluded that the intent of the RLA would be served by applying the RLA to such circumstances. *Id.* at 1051.

Although Pyles[4] asserted that *Nelson* required a contrary conclusion, the Eleventh Circuit Court of Appeals concluded as follows:

We find *Nelson* inapposite. *Nelson* is distinguishable because Pyles was not a mere applicant for employment off the street but rather was employed by an air carrier both prior to and subsequent to the route purchase transaction. More importantly, it was by virtue of his position with Pan Am that appellant was given an opportunity to be considered for a job at United; his employment with Pan Am, not to mention his affiliation with ALPA, put him in a position to be considered before other potential job applicants. As an ALPA member, he benefitted from representation by a national union throughout the course of the transfer negotiations. He cannot accept this status when it benefits him, then disavow it when it is no longer beneficial.

We believe this is precisely the sort of dispute that belongs before a system board of adjustment. During all relevant times, Pyles remained in the employ of an airline. The agreements contemplated just such a

---

4. In *Pyles,* the "applicant" wished to be free of administrative requirements under the RLA, rather than embracing the protection of the Act, as is the case here.

direct transfer of employees from one air-line to another. In fact, Pyles' entire claim is premised on his allegation that he was contractually entitled, pursuant to a modified CBA, to transfer to United. We thus regard Pyles as an employee as defined by, and thus within the scope of, the RLA. *Pyles,* 79 F.3d at 1051–52.

The Track Workers contend that, like Pyles, they were "transfer" employees covered by the RLA entitled to consideration for positions with I & M because of their employment with another common carrier, not just "applicants" for positions with I & M. The court agrees that, as alleged in the complaint, the Track Workers were not mere applicants for employment off the street, but employees of one of the Railroads prior to the track purchase agreement; it was by virtue of their positions with Soo Line that they had an opportunity to be considered for jobs with I & M before other potential job applicants; and I & M had allegedly announced its intention to transfer qualified employees of Soo Line to I & M. *Compare id.* Thus, pursuant to *Pyles,* the Track Workers would be able to pursue their RLA claim.

The Railroads, however, assert that *Pyles* is inapposite, because the Track Workers have not alleged that they were "transfer" workers, but that they were "applicants" for employment with I & M. However, the Track Workers, whether or not they ever described themselves as "transfer" employees in the amended complaint, have alleged facts that place them squarely within the ambit of the RLA as interpreted in *Pyles.*

The Railroads also assert that *Pyles* is inapposite, because that decision involved the question of whether Pyles's state-law claim for breach of a collective bargaining agreement was pre-empted by the RLA. *See Pyles,* 79 F.3d at 1050. They contend that *Nelson,* by contrast, considers precisely the claim asserted here, a claim of an RLA violation brought by an applicant for employment. Therefore, they assert that *Nelson* is the more persuasive authority.

Although *Nelson* involved a similar claim, the facts in that case are distinguishable from those presented here: Nelson apparently was not employed by any common carrier at the time he applied for employment with Piedmont Aviation. *Nelson,* 750 F.2d at 1236 (Nelson had been employed by Wien Air Alaska "during a two-year period when the Air Line Pilots Association ('ALPA') was on strike against Wien," but "subsequently" sought employment with other airlines). The Track Workers, however, at least according to their allegations, were in almost precisely the same situation as was the "applicant" in *Pyles:* Pyles was an employee of one common carrier who sought employment with another when his employer sold routes and aircraft to the other common carrier, who had agreed to hire qualified employees who were presently flying those routes. *See Pyles,* 79 F.3d at 1048. Furthermore, although the claim Pyles was seeking to prosecute differs from the RLA claim asserted by the Track Workers here, the decision in *Pyles* considers precisely the factual situation presented here of an employee with one common carrier who was seeking employment with another common carrier who had bought his route, and articulates the *principles* applicable to the question presented here of whether or not the RLA applies to such a *person. Id.* at 1051–52. In short, the Railroads are looking at the wrong set of facts in attempting to distinguish *Pyles*— those pertaining to the nature of the plaintiff's claim—rather than the facts that are pertinent to the question of whether or not the RLA applies—those pertaining to the plaintiff's employment status with one common carrier while seeking employment with another common carrier who had bought the plaintiff's route.

Thus, the court concludes that *Pyles,* not *Nelson,* is the more persuasive authority here. *Nelson* does not bar the Track Workers' RLA claim, and the Railroads' motions to dismiss the Track Workers' RLA claim must be denied on that account.

### b. *Conspiracy to violate the RLA*

 The Track Workers also contend that, unlike the airline employee in *Nelson,* they have alleged concerted activity by the Railroads to take actions that, had Soo Line committed by itself against its employees, would have violated the RLA. This contention, however, is barred by a decision of this

circuit's court of appeals. It is the law of this circuit that "[f]ederal courts have no jurisdiction to review claims of a conspiracy to violate either a labor contract or federal labor law such as the Railway Labor Act." *Brotherhood of Ry. Carmen v. Missouri Pac. R.R. Co.*, 944 F.2d 1422, 1430 (8th Cir.1991) (citing *Russom v. Sears, Roebuck & Co.*, 558 F.2d 439, 441 n. 3 (8th Cir.1977), *cert. denied*, 434 U.S. 955, 98 S.Ct. 481, 54 L.Ed.2d 313 (1977)).

Counsel for the Track Workers opined that the quoted statement probably applies to collective bargaining disputes, but counsel for the Railroads asserted that the decision says what it means and must be followed. The court concludes that it cannot simply ignore the plain statement in *Brotherhood of Railway Carmen*, a controlling precedent of this circuit. Nor can the court find that the quoted language is *dicta*,[5] because in *Brotherhood of Railway Carmen*, the Eighth Circuit Court of Appeals' sole ground for affirming the district court's grant of summary judgment on the Carmen's claim that the defendants had conspired to violate certain provisions of the RLA was the lack of subject matter jurisdiction over such a claim. *Brotherhood of Ry. Carmen*, 944 F.2d at 1430. Thus, the Eighth Circuit Court of Appeals' statement concerning subject matter jurisdiction over such a claim was necessarily involved in the determination of the cause, not merely incidental or collateral to it. *Cf. Boyer v. County of Washington*, 971 F.2d 100, 102 (8th Cir.1992) (*per curiam*) (noting that a statement in a prior case "was not necessary to decide the issue in the case and is not binding authority [here]"), *cert. denied sub nom. Boyer v. DeClue*, 508 U.S. 974, 113 S.Ct. 2966, 125 L.Ed.2d 666 (1993); *accord Erickson*, 89 F.3d at 1582.

Therefore, this court finds itself bound by *Brotherhood of Railway Carmen*. Consequently, the Track Workers' RLA claim cannot survive the Railroads' motions to dismiss on the basis of allegations of conspiracy to violate the RLA, *id.*, although it can survive on the basis of allegations that the Track Workers were "transfer" employees, as explained in the preceding subsection. *See Pyles*, 79 F.3d at 1051–52.

### c. *"Per se" violations by Soo Line*

■ Furthermore, giving the Track Workers' RLA claim the liberal construction to which it is entitled on a motion to dismiss, *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99, the Track Workers have alleged that Soo Line alone committed wrongs against them while the Track Workers were employed by that Railroad and plainly covered by the RLA—wrongs such as providing the records of the Track Workers' union activities to the alleged "successor" corporation and advising the alleged "successor" corporation on which employees to hire or not to hire on the basis of the employees' union activities, allegedly for the purpose of retaliating or discriminating against the employees for those past union activities. These allegations are sufficient to state a claim under the RLA that Soo Line's " 'actions [against its own employees] have been motivated by anti-union animus or that [the railroad's] actions were an attempt to interfere with its employees' choice of their collective bargaining representative.' " *Brotherhood of Locomotive Eng'rs*, 26 F.3d at 795 (quoting *Tello*, 772 F.2d at 462). Therefore, Soo Line's motion to dismiss the RLA claim will be denied on this further ground.

### d. *"Successor" liability for RLA violations*

■ The Track Workers contend that the RLA applies to I & M as a "successor" to Soo Line, and that its actions should be scrutinized to ensure that it does not discriminate against the predecessor's employees, citing *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 36, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). They contend that *Fall*

---

**5.** *Dicta* is a common abbreviation for *obiter dicta*, and is defined as "words of an opinion that are entirely unnecessary for the decision of the case." BLACK'S LAW DICTIONARY 1072 (6th ed.1990). Examples of dicta include a "remark made, or opinion expressed, by a judge, in his decision upon a cause, 'by the way,' that is, incidentally or collaterally, and not directly upon the question before him, or upon a point not necessarily involved in the determination of the cause, or introduced by way of illustration, or analogy or argument." *Id.*, *see also King v. Erickson*, 89 F.3d 1575, 1582 (Fed.Cir.1996), *rev'd on other grounds sub nom. LaChance v. Erickson*, —— U.S. ——, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998) (quoting same).

*River,* although it is an NLRA case, is instructive as to the RLA as well, citing *Hawaiian Airlines v. Norris,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994).

In *Fall River,* the Supreme Court considered a successor corporation's obligation to bargain with a union that had represented the employees of its predecessor. *Fall River,* 482 U.S. at 29, 107 S.Ct. 2225. The Court wrote,

> We observed in *[NLRB v.] Burns [International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972),]* that, although the successor has an obligation to bargain with the union, it "is ordinarily free to set initial terms on which it will hire the employees of a predecessor," 406 U.S. at 294, 92 S.Ct. 1571, and it is not bound by the substantive provisions of the predecessor's collective-bargaining agreement. *Id.* at 284, 92 S.Ct. 1571. We further explained that the successor is under no obligation to hire the employees of its predecessor, subject, of course, to the restriction that it not discriminate against union employees in its hiring. *Id.* at 280, and n. 5, 92 S.Ct. 1571; *see also Howard Johnson Co. v. Hotel Employees,* 417 U.S. 249, 262, and n. 8, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). Thus, to a substantial extent the applicability of *Burns* rests in the hands of the successor. If the new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor, then the bargaining obligation of § 8(a)(5) is activated. This makes sense when one considers that the employer *intends* to take advantage of the trained work force of its predecessor.

*Fall River,* 482 U.S. at 40–41, 107 S.Ct. 2225. The Court therefore held that a successor's obligation to bargain with the predecessor's union was not limited to the situation in which the union had only recently been certified. *Id.* at 41, 107 S.Ct. 2225. The Track Workers assert that this "successorship doctrine" should be expanded to apply to their RLA claim, because both the RLA and the NLRB seek to maintain labor-management peace at almost any price.

In *Fall River,* the Court explained that the determination of whether a successorship situation is present "is primarily factual in na-ture and is based upon the totality of the circumstances of a given situation," but the "focus [is] on whether the new company has 'acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations.'" *Id.* at 43, 107 S.Ct. 2225 (quoting *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 184, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973)). The question of "substantial continuity" involves consideration of a number of factors, including "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Id.*

The Railroads contend that the Track Workers have not alleged any factual basis for "successorship" liability, if it is otherwise applicable, but have instead pleaded merely the conclusion that I & M bought assets of Soo Line and that it is the "successor" of Soo Line. The Track Workers have indeed alleged that "I & M is a successor business entity to and, in the context of the facts of this case, is the alter ego of the Soo Line." Complaint, ¶ 23. However, they have alleged more than that. To the extent the factors identified in *Fall River* are applicable to railroads, the court finds that the Track Workers have alleged sufficient factual basis for asserting that I & M is the "successor" of Soo Line. The Track Workers have alleged that the business of I & M is essentially the same, in fact, that it is identical, in the section of the Soo Line that I & M has purchased, *see* Complaint, ¶ 22 (I & M agreed to purchase "all contracts and business obligations" of Soo Line); the entire management of the predecessor company was hired by I & M as were most of the employees, who are performing precisely the same tasks under essentially the same supervisors, *see* Complaint, ¶¶ 26 (I & M announced "it would retain all managers of Soo Line in the areas purchased"), 27 ("I & M stated its' [sic] intention to retain all qualified maintenance of way employees."), 39 (the Soo Line managers became employees of I & M

on the date of the transfer of assets); and from these facts it can reasonably be inferred that the services provided by I & M are essentially the same, and for the same customers, as they were when the route was Soo Line's. *Fall River*, 482 U.S. at 40–41, 107 S.Ct. 2225.

However, one difficulty with the Track Workers' assertion of "successor" liability of I & M for violations of the RLA is that the one court to consider whether the "successorship doctrine" concerning union representation applies to the RLA as well as the NLRA has rejected that argument. *See Railway Labor Executives' Ass'n v. Wheeling & Lake Erie Ry.*, 741 F.Supp. 595, 599 (E.D.Va.), *aff'd*, 914 F.2d 53 (4th Cir.1990) (table opinion). In *Wheeling*, Judge Ellis of the United States District Court for the Eastern District of Virginia first defined the "successorship doctrine" as stated in *Fall River*: "This doctrine holds that in certain circumstances a successor employer may have a duty to bargain with the representative certified to the predecessor employer." *Wheeling*, 741 F.Supp. at 596 n. 2 (citing *Fall River*, 482 U.S. at 27, 107 S.Ct. 2225, and *NLRB v. Burns Int'l Sec. Serv., Inc.*, 406 U.S. at 272, 92 S.Ct. 1571). However, he rejected the contention that the doctrine should be imported into the RLA, in the process specifically rejecting the argument the Track Workers make here that both the NLRA and the RLA seek peace at any price. *See id.* at 598–99. Judge Ellis found that the NLRA and RLA "are not animated by the same balance of policy considerations," because the RLA seeks to avoid strikes, while the NLRA proscribes strikes and picketing only in specific circumstances. *Id.* at 598.

Furthermore, Judge Ellis found,

by enacting [a] comprehensive RLA scheme and by creating the [National Mediation Board (NMB)] and granting it exclusive power over representation disputes, Congress has deliberately left no room for the courts to engraft a successorship doctrine onto the RLA. Indeed, it is plain that such a doctrine, even assuming it were to fit the facts at bar, is incompatible with the mandatory RLA, § 2 Ninth procedure and the NMB's exclusive jurisdiction over representation disputes. To hold otherwise would have this Court decide what is the appropriate craft or class and who is, or are, the authorized bargaining representative(s). But Congress has committed these decisions exclusively to the NMB. It follows, then, that to import a successorship doctrine into the RLA context would wrongly have this Court usurp the functions Congress committed solely to the NMB.

*Wheeling*, 741 F.Supp. at 599. In this case, the Track Workers would have this court, by analogy with the successorship doctrine of the NLRA, which applies only to questions of representation, authorize a cause of action under the RLA against the successor corporation and predecessor corporation jointly for refusal of the successor corporation to rehire some of the predecessor's employees, allegedly because of an anti-union animus. Such an expansion of the successorship doctrine to the RLA, where the more limited doctrine has been found to be a poor fit, appears to be inappropriate.

This brings the court to the second difficulty with the Track Workers' "successor liability" argument, which is that, while the NLRA specifically protects new hires from discrimination on the basis of union activity, the RLA does not, *see, e.g., Nelson*, 750 F.2d at 1237; thus, at least at first blush, successor liability of the type sought by the Track Workers is more appropriate to the NLRA than it is to the RLA. Although NLRA concepts may be instructive in RLA cases, courts "will not find NLRA precedent persuasive . . . in the face of relevant RLA precedent." *Brotherhood of Locomotive Eng'rs*, 26 F.3d at 795. *Wheeling* is such persuasive RLA precedent, which, although not binding, is more directly on point than NLRA precedent, such as *Fall River*, particularly when *Wheeling* has considered and rejected the applicability of that NLRA precedent in the context of an RLA claim.

This is not to say that the Track Workers' argument is wholly without appeal: After all, why should a successor and predecessor corporation be allowed to evade the RLA by acting jointly to rid the successor's workforce of union activists? There are cogent reasons for allowing a cause of action to prevent such evasion of the RLA. First, the law recognizes

that, although there is no "successor liability" for a purchasing corporation when the acquisition takes the form of a purchase of assets, there are exceptions to this general rule that are or may be applicable here, *see United States v. First Dakota Nat'l Bank*, 137 F.3d 1077, 1080 (8th Cir.1998) (applying South Dakota law); *Cooper v. Lakewood Eng'g and Mfg. Co.*, 45 F.3d 243, 245 (8th Cir.1995) (applying Minnesota law); *Grand Lab., Inc. v. Midcon Lab.*, 32 F.3d 1277, 1283 (8th Cir.1994) (applying Iowa law); *Pancratz v. Monsanto Co.*, 547 N.W.2d 198, 200 (Iowa 1996), taking the allegations of the amended complaint as true. *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99. These exceptions include the following: (1) when the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liability, *First Dakota*, 137 F.3d at 1080; *Cooper*, 45 F.3d at 245, *Pancratz*, 547 N.W.2d at 200–01; (2) where the purchasing corporation is merely a continuation of the selling corporation, *Cooper*, 45 F.3d at 245; *Grand Lab., Inc.*, 32 F.3d at 1283; *Pancratz*, 547 N.W.2d at 200; and (3) where the transaction is entered into fraudulently in order to escape liability. *Cooper*, 45 F.3d at 245; *Pancratz*, 547 N.W.2d at 200.[6] The Track Workers allege that I & M specifically agreed to assume all of Soo Line's contracts and business obligations and announced its intention to hire all of Soo Line's managers and qualified employees; they allege that I & M is a continuation of Soo Line; and they allege that Soo Line and I & M took advantage of the transfer of assets to allow I & M not to rehire union activists, with the advice and connivance of Soo Line managers, even though Soo Line could not itself fire those union activists, suggesting that the transfer was a fraud for the purpose of committing anti-union acts.

Furthermore, *Wheeling* is distinguishable. *Wheeling* rejected the narrowly defined "successorship doctrine"—which concerns a successor's obligation to bargain with a predecessor's collective bargaining representative—on the ground that the RLA provides exclusive means for resolving such a claim

without judicial intervention. *Wheeling*, 741 F.Supp. at 599. However, courts *have* recognized a judicial cause of action for "anti-union animus" in violation of 45 U.S.C. § 152 Third & Fourth, *Brotherhood of Locomotive Eng'rs*, 26 F.3d at 795, which means that the cause of action asserted against a successor here is not within the exclusive jurisdiction of the NMB. In these circumstances, *Wheeling* does not convince the court that the Track Workers' RLA claim is barred.

Thus, there is no "insuperable bar" to the Track Workers' assertion of successor liability for RLA violations requiring dismissal of such a claim, *Parnes*, 122 F.3d at 546; *Frey*, 44 F.3d at 671, because, at this stage of the proceedings, it appears that there is some set of facts that could be proved consistent with the allegations that would entitle the Track Workers to relief on their RLA claim. *Handeen*, 112 F.3d at 1347; *accord Conley*, 355 U.S. at 45–46, 78 S.Ct. 99; *Parnes*, 122 F.3d at 546; *Doe*, 107 F.3d at 1304; *WMX Techs., Inc.*, 105 F.3d at 1198. Therefore, on the grounds that the Track Workers have alleged that they were "transfer employees," *Pyles*, 79 F.3d at 1051–52, that Soo Line alone has violated the RLA, and that there was a predecessor-successor relationship between Soo Line and I & M, the Railroads' motions to dismiss the Track Workers' RLA claims will be denied.

### C. The FELA Claim

The Track Workers' second cause of action is a claim alleging violations of the express and implied provisions of the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.*, and companion regulations of the Federal Railroad Administration (FRA), 49 C.F.R. § 225 *et seq.* This claim alleges that I & M violated the FELA by asking questions of applicants about their prior work-related injuries and claims and by refusing employment to some existing workers of Soo Line on the basis of this information as well as similar information obtained from Soo Line, and that Soo Line violated the

---

6. A fourth exception, not applicable here even reading the Track Workers' allegations liberally, is where the transaction amounts to a consolidation or merger of corporations. *See Cooper*, 45 F.3d at 245; *Pancratz*, 547 N.W.2d at 200. As

alleged, Soo Line has, if anything, "spun off" the route it sold to I & M, rather than consolidating or merging with I & M, and the two companies remain separate entities.

FELA by providing to I & M information about applicants' disabilities and injury claims while employed with Soo Line. The Track Workers allege that the Railroads conspired to deprive them of employment based in whole or in part on their legally protected acts of reporting injuries and filing claims for such injuries.[7] They demand the identical relief asserted in their first cause of action, as well as declaratory and injunctive relief precluding further inquiry into or use of such information.

I & M has moved to dismiss this cause of action for failure to state a claim upon which relief can be granted, pursuant to FED. R. CIV. P. 12(b)(6), and Soo Line has moved to dismiss it for lack of subject matter jurisdiction, pursuant to FED. R. CIV. P. 12(b)(1). Whichever subdivision of Rule 12 is identified as the basis for motions, the Railroads both contend that the Track Workers' FELA claim must be dismissed, because the FELA simply does not authorize the kind of claim the Track Workers have asserted. I & M contends that the FELA provides a remedy only for railroad employees who have suffered personal injuries as a result of negligence of their employer, which the Track Workers do not allege is the nature of their claim, and that, in any event, the FELA does not provide a cause of action for applicants. Soo Line asserts that the courts of appeals of this and other circuits have specifically rejected the contention that the FELA authorizes a cause of action for retaliation for filing a FELA claim, citing *Landfried v. Terminal R.R. Ass'n of St. Louis,* 721 F.2d 254 (8th Cir.1983), *cert. denied,* 466 U.S. 928, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984). Like I & M, Soo Line contends that the FELA does not apply to applicants for positions. The Track Workers counter that their cause of action fits within the language of 45 U.S.C. § 60 of the FELA and that, in any event, a retaliatory discharge for filing a FELA claim is contrary to the public policy of the state of Iowa and as such is actionable.

### 1. The purpose and scope of the FELA

"FELA, enacted in 1908, creates a federal statutory cause of action for employees of interstate carriers (railroads) against their employers for injuries incurred in the course of employment." *Nordgren v. Burlington Northern R.R. Co.,* 101 F.3d 1246, 1249 (8th Cir.1996). The FELA also "preempts state-law personal injury claims by injured railroad employees against their employers and creates a uniform federal law of liability in this field." *Id.* at 1250 (citing *New York Central R.R. v. Winfield,* 244 U.S. 147, 150, 37 S.Ct. 546, 61 L.Ed. 1045 (1917)). The Supreme Court has recognized that the FELA is a "broad remedial statute," and therefore must be construed "liberally" in order to accomplish Congress's goals. *Id.* at 1249 (citing *Atchison, Topeka & Santa Fe Railway v. Buell,* 480 U.S. 557, 562, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987)). "At the same time, the Court has maintained that FELA does have limitations and must be interpreted 'in the appropriate historical context.'" *Id.* (quoting *Monessen S.W. Railway v. Morgan,* 486 U.S. 330, 337, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988)).

Section 60 of the FELA, upon which the Track Workers assert their claim is based, provides, in pertinent part, as follows:

**§ 60. Penalty for suppression of voluntary information incident to accidents; separability of provisions**

Any contract, rule, regulation, or device whatsoever, the purpose, intent, or effect of which shall be to prevent employees of any common carrier from furnishing voluntarily information to a person in interest as to the facts incident to the injury or death of any employee, shall be void, and whoever, by threat, intimidation, order, rule, contract, regulation, or device whatsoever, shall attempt to prevent any person from furnishing voluntarily such information to a person in interest, or whoever discharges or otherwise disciplines or attempts to discipline any employee for furnishing voluntarily such information to a person in interest, shall, upon conviction thereof, be punished by a fine of not more than $1,000 or imprisoned for not more than one year, or by both such fine and imprisonment, for each offense: *Provided,* That nothing herein contained shall be construed to void any

---

**7.** This amended complaint does not identify which subset of plaintiffs are asserting this claim.

Thus, the court concludes that all plaintiffs are asserting it.

contract, rule, or regulation with respect to any information contained in the files of the carrier, or other privileged or confidential reports....

45 U.S.C. § 60.[8]

### 2. Does the FELA authorize a cause of action for retaliation against a claimant?

 As mentioned above, the Railroads contend that any claim of retaliation for filing FELA claims is barred by *Landfried v. Terminal R.R. Ass'n of St. Louis*, 721 F.2d 254 (8th Cir.1983), *cert. denied*, 466 U.S. 928, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984). In *Landfried*, the Eighth Circuit Court of Appeals considered whether railroad employees had a claim cognizable in federal court that they had been terminated in retaliation for bringing actions against their employer under the FELA. *Landfried*, 721 F.2d at 254. The railroad defendant contended that the plaintiffs were discharged for having violated various safety and work rules in a manner consistent with the agreements between the defendant and the unions to which the plaintiffs belonged. *Id.* at 255.

The Eighth Circuit Court of Appeals first concluded that "it appears that resolution of plaintiffs' claims will depend at least in part on interpretation of the applicable collective bargaining agreements. Under *Andrews [v. Louisville and Nashville R.R.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972),] such claims are subject to the RLA's provisions for processing of grievances and the federal courts are barred from adjudicating them." *Id.* The Eighth Circuit Court of Appeals then noted the following:

> We might reach a different conclusion if, as in *Hendley v. Central of Georgia Railroad Co.*, 609 F.2d 1146 (5th Cir.1980),

*cert. denied*, 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981), plaintiffs could show that their discharge constitutes the violation of a specific federal statutory section. But we do not need to decide whether we would adopt the view taken by the Fifth Circuit in *Hendley*, for *the fact is that Congress has not enacted a statute prohibiting an employer from discharging an employee in retaliation for filing a FELA action.* Given the availability to plaintiffs of recourse to the arbitration procedure established under the RLA, there is little reason for a federal court to imply a right of action where Congress has not acted to create one. Although the language of 45 U.S.C. § 55 declares "void" any "device" utilized by a common carrier to exempt itself from FELA liability, that section does not provide a cause of action for an employee discharged in retaliation for filing a FELA action. *See Bay [v. Western Pac. R.R. Co.*, 595 F.2d 514 (9th Cir.1979)]. In *Bay*, the court traced the legislative history of § 55 and concluded that Congress's purpose was to void contracts discharging the common carrier from liability for personal injuries suffered by its employees. "[Section 55] was not intended to afford a cause of action, separate from that for recovery of damages for injury under FELA, against an employer that engages in a device to exempt itself from FELA liability." *Id.* at 516 (footnote omitted).

*Landfried*, 721 F.2d at 256.

Although the Track Workers object that *Landfried* concerns § 55,[9] while their claim is pursuant to § 60, there are more persuasive grounds for disregarding *Landfried*. The Eighth Circuit Court of Appeals has also

---

**8.** The court can find no part of 29 C.F.R. § 225—which provides regulation for reports, classification, and investigations of railroad accidents and incidents—that prohibits retaliation against employees who report or testify concerning such accidents or incidents, and the Track Workers have not specifically identified any pertinent section.

**9.** Section 55, which was at issue in *Landfried*, provides as follows:

> **§ 55. Contract, rule, regulation, or device exempting from liability; set-off**

> Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void: *Provided*, That in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought. 45 U.S.C. § 55.

specifically considered whether § 60 provides the cause of action the Track Workers seek to assert here:

> The only basis for relief Hornsby asserts [for money damages for firing him for testifying about a co-employee's FELA claim] is 45 U.S.C. § 60, a criminal statute designed to protect FELA witnesses from retaliation by their employers. Other circuit courts in construing this statute have recognized only a very narrow kind of civil relief. *Courts have given equitable relief, including back pay, to prevent violation of § 60. See Hendley v. Central of Georgia R.R.,* 609 F.2d 1146, 1152–53 & n. 5 (5th Cir.1980), *cert. denied,* 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981). "[A] district court's ability to enjoin a hearing or conduct which violates § 60 is essential to effectuate the purpose of the section." *Id.* at 1152. *However, § 60 does not create a private cause of action for compensatory damages. Lewy v. Southern Pac. Transp. Co.,* 799 F.2d 1281, 1293 (9th Cir.1986). After recognizing the *Hendley* and *Gonzalez* holdings that section 60 provides statutory authority for injunctive relief, *Lewy* states: *"[A]t most, [§ 60] appears to authorize courts to exercise equitable jurisdiction over retaliation claims, and thus to award back pay, but not additional money damages."* 799 F.2d at 1293 (citations omitted). We do not believe that those courts that have granted relief under § 60 considered themselves to be recognizing new legal rights, but merely to be preserving the efficacy of a criminal prohibition. *See Gonzalez [v. Southern Pacific Transportation],* 773 F.2d [637] at 644–45 [(5th Cir.1985)]. Such prohibition in the civil context is effectuated by injunctive or equitable relief and this has been the extent of the remedy that has been recognized.

*Hornsby v. St. Louis Southwestern Ry. Co.,* 963 F.2d 1130, 1132–33 (8th Cir.) (emphasis added), *cert. denied,* 506 U.S. 955, 113 S.Ct. 413, 121 L.Ed.2d 337 (1992). The Track Workers assert that *Hornsby* supports their argument that the FELA does authorize a retaliation claim pursuant to § 60, while the Railroads have reiterated their reliance on *Landfried.*

Nowhere in the *Hornsby* decision does the court cite, discuss, or distinguish the prior decision in *Landfried.* However, a careful reading of the section of *Landfried* upon which the Railroads rely reveals that it is in fact *dicta.* Unlike the Eighth Circuit Court of Appeals' statement concerning subject matter jurisdiction over a claim of conspiracy to violate the RLA in *Brotherhood of Ry. Carmen,* 944 F.2d at 1430, discussed above, which was necessarily involved in the determination of the cause, not merely incidental or collateral to it, the comments of the court in *Landfried* concerning whether the FELA authorizes an action for retaliation by the injured employee are *not* necessarily involved in the determination of the cause, but merely incidental or collateral to it. *See Boyer,* 971 F.2d at 102 (noting that a statement in a prior case "was not necessary to decide the issue in the case and is not binding authority [here]"); *accord Erickson,* 89 F.3d at 1582. In *Landfried,* the court founded its determination that it was barred from adjudicating the plaintiffs' retaliation claims on the ground that those claims involved interpretation of the applicable collective bargaining agreements. *Landfried,* 721 F.2d at 255. The court's further statement that it *"might* reach a different conclusion *if* ... plaintiffs could show that their discharge constitutes the violation of a specific federal statutory section," *id.* at 256 (emphasis added), indicates that the court was considering matters, cast in hypothetical terms, beyond what was necessary to its holding. At this point, it is instructive to consider the fact that *Landfried* found no specific federal statutory section that was violated by retaliatory discharge, and discussed specifically only § 55, apparently overlooking § 60, but the court in *Hornsby* found such a statutory section elsewhere, in § 60, when the question was squarely before it. Furthermore, this court is bound to follow the later decision, *Hornsby,* even if it appears to overrule the prior decision, *Landfried, sub silentio* on the question of whether any provision of the FELA authorizes a cause of action for retaliation for filing a FELA claim. Nor can this court disregard *Hornsby* on the authority of later precedent from other circuits, such as *Shrader v. CSX Transp., Inc.,* 70 F.3d 255,

257–58 (2d Cir.1995), in which the Second Circuit Court of Appeals held that § 60 did not authorize a cause of action for retaliation against an employee for reporting his or her own injury.

The court finds that in *Hornsby*, the Eighth Circuit Court of Appeals has recognized a FELA retaliation claim pursuant to § 60 for *witnesses* in FELA claims proceedings. Because it would make little sense to provide such a remedy for *witnesses*, but not for the FELA *claimant*, this court reads § 60 and *Hornsby* to authorize the Track Workers' FELA retaliation claim. Indeed, the language of § 60 is in no wise restricted to "witnesses"; rather, it states that an employer may not prevent "employees" or "persons" from furnishing information about injuries or deaths "of any employee." 45 U.S.C. § 60. This language plainly encompasses an employee reporting an accident in which he or she was himself or herself the injured party,[10] although the court acknowledges that other circuit courts of appeals have looked beyond the "plain meaning" of the statute to legislative history to conclude that § 60 does not protect an employee from retaliation for reporting his or her own injury, even if it protects other witnesses, because such protection for the injured employee is available instead through administrative procedures of the RLA. *See Shrader*, 70 F.3d at 257–58; *Mayon v. Southern Pac. Transp. Co.*, 805 F.2d 1250, 1252–53 (5th Cir.1986). The plain meaning of the statute and the

---

10. "The task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Chevron U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *United States v. Union Elec. Co.*, 64 F.3d 1152, 1165 (8th Cir.1995) (citing *Ron Pair*); *United States ex rel. Harlan v. Bacon*, 21 F.3d 209, 210 (8th Cir.1994) ("When construing a statute, we are obliged to look first to the plain meaning of the words employed by the legislature . . .," citing *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778); *United States v. Manthei*, 979 F.2d 124, 126 (8th Cir. 1992) ("When interpreting statutory language, the court must first look to the plain meaning of the language," citing *North Dakota v. United States*, 460 U.S. 300, 312–13, 103 S.Ct. 1095, 75 L.Ed.2d 77 (1983)). The Supreme Court describes this rule as the "one, cardinal canon before all others." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). Thus, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (citing *Ron Pair*, 489 U.S. at 241–42, 109 S.Ct. 1026; *United States v. Goldenberg*, 168 U.S. 95, 102–03, 18 S.Ct. 3, 42 L.Ed. 394 (1897); *Oneale v. Thornton*, 6 Cranch 53, 68, 3 L.Ed. 150 (1810)).

When the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances "the sole function of the courts is to enforce [the statute] according to its terms." *Ron Pair*, 489 U.S. at 241, 109 S.Ct. 1026 (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)); *Union Elec.*, 64 F.3d at 1165 (quoting *Ron Pair*); *Melahn v. Pennock Ins., Inc.*, 965 F.2d 1497, 1502 (8th Cir.1992) (plain meaning of a statute governs over ambiguous legislative history, citing *Ron Pair Enterprises*). The plain meaning of a statute is decisive, "except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Ron Pair*, 489 U.S. at 242, 109 S.Ct. 1026 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 452, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring in judgment) (ordinary meaning governs unless implementing it would be "patent absurdity"); *Waugh v. Internal Revenue Serv.*, 109 F.3d 489, 493 (8th Cir.) (quoting *Ron Pair*), cert. denied, —— U.S. ——, 118 S.Ct. 80, 139 L.Ed.2d 38 (1997); *Missouri v. L.J. O'Neill Shoe Co.*, 64 F.3d 1146, 1150 (8th Cir.1995); *Union Elec.*, 64 F.3d at 1165.

However, "[p]lain meaning, like beauty, is sometimes in the eye of the beholder," *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 737, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). Thus, the court must not reach its decision about the meaning of a statute

> by a strict construction of the words of the Act, nor by application of artificial canons of construction. On the contrary, we are to read the statutory language in its ordinary and natural sense, and if doubts remain, resolve them in the light, not only of the policy intended to be served by the enactment, but, as well, by all other available aids to construction. But it is not our function to engraft on a statute additions which we think the legislature logically might or should have made.

*Bacon*, 21 F.3d at 210–11 (quoting *United States v. Cooper Corp.*, 312 U.S. 600, 605, 61 S.Ct. 742, 85 L.Ed. 1071 (1941)). Thus, the court must assume that the words of a statute, construed in their ordinary meaning, accurately express the legislative purpose, and the court should decline to frustrate the plain meaning of the words chosen by the legislature. *United States v. Talley*, 16 F.3d 972, 976 (8th Cir.1994).

guidance of binding precedent in *Hornsby* require the court to conclude that there is a FELA claim for retaliation by the injured employee himself or herself pursuant to 45 U.S.C. § 60.

### 3. Does Iowa public policy authorize the cause of action?

Although the court concludes that there is a cause of action for retaliation for filing a FELA claim authorized by the FELA itself pursuant to 45 U.S.C. § 60, the court must consider, at least briefly, the Track Workers' assertion that Iowa public policy would also authorize such a cause of action. A claim of violation of Iowa public policy may be based on violation of a federal statute. *Smuck v. National Management Corp.*, 540 N.W.2d 669, 672 (Iowa App.1995) ("We agree ... that federal law can serve as an appropriate source for state public policy."). However, because the federal statute in question here, the FELA, itself authorizes a cause of action for retaliation in § 60, the Railroads' motion to dismiss the FELA retaliation claim will be denied on that basis, without consideration of whether Iowa public policy would also authorize the claim.

Nor will the court pass on the adequacy of a separate cause of action for violation of public policy. Although the Track Workers' counsel asserted at oral arguments that, under notice pleading, the Track Workers were entitled to recover on any theory supported by the facts pleaded, whether the theory is specifically stated or not, clearly the Railroads did not understand the Track Workers to be asserting a separate claim for violation of public policy; and rightly so, because the Track Workers did not separately identify violation of public policy as one of their causes of action, although they identified all of the others. Therefore, the parties have not adequately briefed the question of the viability of such a separate cause of action here. If the Track Workers intend to pursue a separate cause of action for violation of public policy, the court will require them to plead such a claim with more specificity as a separate cause of action.

There are two further reasons not to pass on the question of the viability of such a claim. Although the Railroads contended that the Iowa tort applies only to a "dis-charge," the Track Workers assert that their complaint could reasonably be read to allege a "constructive discharge" of at least some of the plaintiffs from employment with Soo Line, as the result of loss of employment opportunities in their "home" regions stemming from FELA retaliation, which prevented employment with I & M in the Track Workers' "home" regions. *See* Complaint, ¶¶ 76, 88–89. However, as to employees who continued their employment with Soo Line, the parties have not briefed to any significant degree the question of whether the Iowa claim for violation of public policy goes so far as to protect workers from adverse employment consequences that fall short of a discharge. Therefore, the court will leave that question for later, should the Track Workers assert a separate public policy claim.

The court also observes that such a state-law cause of action for retaliation for filing FELA claims may be pre-empted by the FELA. Although the Eighth Circuit Court of Appeals held in *Nordgren* that the FELA "preempts state-law personal injury claims by injured railroad employees against their employers and creates a uniform federal law of liability in this field," *Nordgren*, 101 F.3d at 1250 (citing *Winfield*, 244 U.S. at 150, 37 S.Ct. 546), it is unclear whether the FELA would pre-empt a claim of retaliation pursuant to § 60, as such a claim is not founded on employer negligence. Again, the court will leave open this question, at least for the purposes of resolving the present motions, because the parties have not adequately briefed the question of FELA pre-emption of a public policy tort.

### 4. The relief available

However, as *Hornsby* makes clear, the extent of the relief that can be granted on a FELA retaliation claim pursuant to 45 U.S.C. § 60 is not as expansive as that sought by the Track Workers: it goes only so far as equitable relief—which would include the Track Workers' prayer for back pay and front pay, declaratory and injunctive relief—but it does not provide for recovery for "compensatory" damages—such as the damages for emotional distress, travel expenses, and other losses compensable at

law—that the Track Workers also seek. *Hornsby,* 963 F.2d at 1133. Therefore, the Railroads' motions to dismiss the FELA claims should be granted only in part, that is, only as to the prayer for compensatory damages, at least if the FELA is applicable to the Track Workers, whom the Railroads contend are not covered as "applicants" for employment.

### 5. Can "applicants" assert a FELA retaliation claim?

 The Railroads assert that the FELA provides protection only for persons engaged in an employer-employee relationship, not for mere applicants for employment, citing *Smith v. Medical & Surgical Clinic Ass'n,* 118 F.3d 416, 419 (5th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1034, 140 L.Ed.2d 102 (1998), and *Kelley v. Southern Pac. Co.,* 419 U.S. 318, 323–24, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974). While it may be true that only an employee can bring a claim pursuant to the FELA for negligence against an employer for injuries the employee has suffered, § 60, which authorizes the retaliation claim at issue here, is *not* so restricted. Rather, as noted above, § 60 provides that *"whoever,* by threat, intimidation, order, rule, contract, regulation, or device whatsoever, shall attempt to prevent *any person* from furnishing voluntarily [information concerning the injury or death of a railroad employee] to a person in interest" has committed a crime. 45 U.S.C. § 60 (emphasis added). Language as broad as "whoever" is not restricted to an "employer," particularly when the statute otherwise specifically prohibits an "employer" from engaging in certain conduct. *See id.* Nor is "any person" restricted to "employees," particularly where the statute otherwise specifically protects "employees" from certain wrongful acts. *See id.* Thus, the court concludes that the statute contemplates a cause of action by applicants for employment, such as the Track Workers, against a prospective employer, such as I & M, for taking actions (any "device whatsoever") to prevent or "chill" the activity of the applicants who are employed by another common carrier, such as Soo Line, from reporting workplace injuries pursuant to the FELA to the applicants' present employer, Soo Line.

Furthermore, the court finds that a FELA retaliation cause of action by the Track Workers against their then-employer, Soo Line, is authorized by § 60, for actions by Soo Line (any "device whatsoever") that were calculated to or would have the effect of chilling reporting of injuries pursuant to the FELA. The conduct Soo Line is alleged to have engaged in—reporting all information concerning FELA claims and injuries to a prospective employer and engaging in the decision-making process to prevent workers who made such claims from obtaining re-employment with an alleged successor corporation—fits within the plain meaning of either of the first two prohibitions found in § 60. That is, such conduct is any "device whatsoever, the purpose, intent, or effect of which shall be to prevent employees [the Track Workers] of any common carrier [Soo Line] from furnishing voluntarily information to a person in interest [Soo Line] as to the facts incident to the injury or death of any employee [any of the Track Workers]," and it is also conduct by "whoever" that "by threat, intimidation, order, rule, contract, regulation, or device whatsoever ... attempt[s] to prevent any person from furnishing voluntarily such information to a person in interest." 45 U.S.C. § 60.

Thus, the court concludes that the Track Workers have stated a cognizable FELA retaliation claim against either of the defendant Railroads over which this court has subject matter jurisdiction. Consequently, the Railroads' motions to dismiss the Track Workers' FELA claim will be denied.

### D. The ADA Claim

I & M also challenges the Track Workers' third cause of action, which alleges violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* This cause of action asserts that I & M's decision not to rehire the plaintiffs [11] was based on their disabilities or perceived disabilities within the meaning of the ADA, even though they were

---

**11.** Again, which plaintiffs are asserting this claim is not indicated; therefore, the court assumes the claim is asserted by all of them.

934

qualified to perform and were performing their jobs with Soo Line. As the court reads the complaint, this claim is asserted only against I & M, and, indeed, only I & M has moved to dismiss it.

I & M asserts that the Track Workers have only alleged in conclusory fashion that they are disabled within the meaning of the ADA, but have failed to allege, or allege facts sufficient to show, that any of them suffers from "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." *See* 42 U.S.C. § 12102(2). The Track Workers respond, first, that they have alleged *per se* violations of the ADA, because asking an applicant about his or her workers' compensation, injury, or disability history is prohibited by 42 U.S.C. § 12112, 29 C.F.R. § 1630.14(b)(1), and the EEOC Guidelines to Pre–Employment Questions (1995), p. 9. Second, they assert that they have adequately pleaded both disability and perceived disability within the meaning of the ADA.

### 1. Pre-employment inquiries concerning disabilities

The ADA does indeed state some prohibitions or limitations on inquiries into whether a job applicant has a disability or the extent of such a disability in 42 U.S.C. § 12112. The pertinent portion of that section of the ADA is the following:

**(d) Medical examinations and inquiries**

**(1) In general**

The prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries.

**(2) Preemployment**

**(A) Prohibited examination or inquiry**

Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability.

**(B) Acceptable inquiry**

A covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions.

**(3) Employment entrance examination**

A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if—

**(A)** all entering employees are subjected to such an examination regardless of disability;

**(B)** information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that—

(i) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(ii) first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

(iv) government officials investigating compliance with this chapter shall be provided relevant information on request; and

**(C)** the results of such examination are used only in accordance with this subchapter.

**(4) Examination and inquiry**

**(A) Prohibited examinations and inquiries**

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

**(B) Acceptable examinations and inquiries**

A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

**(C) Requirement**

Information obtained under subparagraph (B) regarding the medical condition or history of an employee are [sic] subject to the requirements of subparagraphs (B) and (C) of paragraph (3).

42 U.S.C. § 12112. However, the fact that the ADA prohibits certain kinds of pre-employment inquiries does not, in and of itself, establish that a particular plaintiff has a cause of action for violation of this prohibition.

**2. Does § 12112(d) authorize a cause of action for improper inquiries?**

 The most thorough analysis of the question of whether § 12112(d) authorizes a cause of action by any plaintiff for prohibited inquiries was undertaken by Magistrate Judge Riedlinger of the United States District Court for the Middle District of Louisiana in *Armstrong v. Turner Indus., Ltd.*, 950 F.Supp. 162 (M.D.La.1996), *aff'd*, 141 F.3d 554 (5th Cir.1998). After quoting § 12112(d)(2)(A) & (3) of the statute, which are set forth above, Judge Riedlinger reasoned as follows:

> Viewing these parts of the statute in isolation, the use of the term "job applicant" without any qualification or modifiers appears to lend support to the argument that an individual who is not a "qualified individual with a disability" can bring a claim under the ADA if an employer violates § 12112(d)(2)-(3). Defining the plain meaning of a statutory word or phrase, however, is only the starting point in statutory construction. Not only the bare meaning of the word but also its placement and purpose in the statutory scheme must be considered. *Rowinsky v. Bryan Independent School District*, 80 F.3d 1006, 1012 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 165, 136 L.Ed.2d 108 (1996). "The meaning of statutory language, plain or not, depends on context." *Id.*

> Applying this principle, nothing in the remainder of the statute suggests that the use of the term job applicant should be interpreted to mean that any job applicant, regardless of disability, has a claim for violation of the prohibitions related to preemployment inquiries. The first paragraph under the subsection title and preceding § 12112(d)(2)(A) states that "[t]he prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries." 42 U.S.C. § 12112(d)(1). This is a reference to § 12112(a) which sets forth the general rule prohibiting discrimination against a "qualified individual with a disability ... in regard to job application procedures," hiring, advancement, discharge, compensation, job training and other terms, conditions and privileges of employment. Thus, the prohibition against preemployment inquiries specifically refers back to the general prohibition against discrimination against qualified individuals with disabilities. Throughout the next paragraph, which is § 12112(b), the statute further defines the types of discrimination prohibited and continues to refer to job applicants or employees who are otherwise qualified individuals with disabilities.

> There is also nothing in the legislative history which supports the conclusion that Congress intended any job applicant to have a cause of action for violation of the ADA rules on preemployment examinations and inquiries. A review of the legislative history shows that the section on medical examinations and inquiries was included to parallel the same requirements and regulations under the Rehabilitation Act of 1973, and designed to prevent employers from using preemployment information obtained from forms and interviews to exclude applicants with disabilities, particularly persons with "hidden" disabilities. H.R.Rep. No. 101–485(III), 101st Cong., 2d Sess. 43, 44 (1990), reprinted in, 1990 U.S.C.C.A.N. 445, 465–67. Again, the legislative history indicates that the preemployment provisions exist to protect qualified individuals with disabilities—those who are disabled within the meaning of the

ADA—not job applicants who do not meet any of the definitions of disability in § 12102(2).

Considering the placement and purpose of the ADA restrictions on medical inquiries of job applicants found in § 12112(d) in the context of the entire statute, *the most reasonable interpretation is that if a separate claim can be brought for violation of this section, it must be brought by a qualified individual with a disability as that term is defined by the ADA.* Since there is no evidence that the plaintiff is disabled within the meaning of the ADA, the defendant is entitled to summary judgment as a matter of law on the plaintiff's claim that the defendant conducted a medical inquiry and examination in violation of 42 U.S.C. § 12112(d).

*Armstrong,* 950 F.Supp. at 167–68 (emphasis added).

On appeal, the Fifth Circuit Court of Appeals stated that the question presented, "whether the ADA provides a private right of action for nondisabled job applicants who are subjected to preemployment medical examinations and inquiries in violation of section 12112(d)(2)(A)," was one of first impression among the circuit courts of appeals. *Armstrong v. Turner Indus., Inc.,* 141 F.3d 554, 558 (5th Cir.1998). Without discounting the importance of this question, however, the Fifth Circuit Court of Appeals found that the appeal could be resolved without answering it, because the court concluded that "Armstrong has not demonstrated any injury redressable by damages, and he lacks standing to seek declaratory and injunctive relief," where he conceded he was not disabled within the meaning of the ADA, "so dismissal of his section 12112(d)(2)(A) claim was proper in any event, whether or not in some other context a nondisabled individual might be afforded judicial relief in respect to a section 12112(d)(2)(A) violation." *Id.* Assuming that there was such a cause of action for such a plaintiff, the court did "hold that damages liability under section 12112(d)(2)(A) must be based on something more than a mere violation of that provision. There must be some cognizable injury in fact of which the violation is a legal and proximate cause for damages to arise from a single violation." *Id.* at 561. As to injunctive relief, the court concluded that Armstrong lacked standing, because he had "alleged only a single, past statutory violation and does not assert any likelihood that he will be subjected to a similar violation in the future." *Id.* at 563.

Chief Judge Kern of the United States District Court for the Northern District of Oklahoma agreed with Magistrate Judge Reidlinger, citing *Armstrong* with approval in *Griffin v. Steeltek, Inc.,* 964 F.Supp. 317 (N.D.Okla.1997). After examining the provisions of § 12112(d)(2)(A), the court in *Griffin* noted that applicable regulations also "make it clear that employers are not to inquire about an applicant's workers' compensation history." *Griffin,* 964 F.Supp. at 318 (citing Appendix to 29 C.F.R. § 1630.13(a)). The court then wrote,

There is no explicit language in Title I of the ADA providing a cause of action for nondisabled job applicants pursuant to 42 U.S.C. § 12112(d)(2)(A). Although that subsection does define such inquiries as discrimination, it also makes a direct reference to subsection (a), which is the general rule prohibiting discrimination against a *qualified individual with a disability.* Additionally, the EEOC regulations specify only defenses to disparate treatment charges brought under §§ 1630.4 through 1630.8, and 1630.11 through 1630.12. *See,* 29 C.F.R. § 1630.15. There is no mention in the regulations of a defense to a disparate treatment charge arising solely out of a 42 U.S.C. § 12112(d)(2)(A) violation. Similarly, the purpose statement of the ADA clearly indicates that the ADA was intended to prevent discrimination against individuals who are disabled, or who suffer discrimination because they are perceived as disabled. *See,* 42 U.S.C. § 12101(b) (stating four purposes for the ADA; each of which specifically mention individuals *with disabilities* ).

*Griffin,* 964 F.Supp. at 318–19 (emphasis in the original). Therefore, the court in *Griffin* agreed with the decision in *Armstrong* to hold that "a prima facie case of employment discrimination under § 102 of the ADA necessarily requires a finding of disability as defined under the ADA." *Id.* at 319.

In *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221 (10th Cir.1997), the Tenth Circuit Court of Appeals cited *Griffin* for the proposition that the ADA does not provide a right of action pursuant to § 12112(d)(2)(A) for an unsuccessful job applicant subjected to a prohibited inquiry if the applicant is not disabled, but held that a present employee may sue for injunctive relief from such a prohibited inquiry pursuant to § 12112(d)(4), whether or not the employee can prove that she is an individual with a disability. *Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d at 1229 & n. 5. The Tenth Circuit Court of Appeals agreed with the district court below that "[t]his provision applies to all employees. Unlike suits based on a failure to provide a reasonable accommodation, this provision is not limited to qualified individuals with disabilities." *Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d at 1229 & n. 5. However, the Track Workers cannot assert such a claim pursuant to § 12112(d)(4) against I & M, because they were not employed by I & M within the meaning of the ADA.

This court agrees with the cogent reasoning of these precedents and concludes that the Track Workers, as applicants for employment with I & M within the meaning of the ADA, can state a claim of *"per se"* violation of § 12112(d)(2) of the ADA for prohibited inquiries *only if* they can also state a claim that they are disabled within the meaning of the ADA.

### 3. *Pleading of disability and perceived disability*

Whether or not the Track Workers have adequately alleged that they are "disabled" within the meaning of the ADA therefore is critical to whether they have adequately alleged a *"per se"* violation of the ADA, based on improper inquiries, as well as their assertion that they were discriminated against on the basis of their disabilities in I & M's refusal to hire them. Courts vary considerably on the nature of the allegations that are sufficient to plead that a plaintiff is disabled within the meaning of the ADA. For example, the Seventh Circuit Court of Appeals, considering one pleading of disability, concluded as follows:

The district court recognized that Homeyer's complaint alleged that her physical condition (chronic severe allergic rhinitis and sinusitis) substantially impaired her ability to breathe and that her condition, when aggravated by ETS, substantially limited her ability to work. With these allegations, it would seem that under the liberal federal notice pleading standards, Homeyer sufficiently pled the initial elements of an ADA claim, i.e., that she suffers from a "disability" as defined in the Act. Homeyer was not required to plead facts or evidence to support her allegations; she was not even required to include a theory of the case. Her complaint was clear enough to inform STA of her claim:

*Homeyer v. Stanley Tulchin Assocs., Inc.*, 91 F.3d 959, 961 (7th Cir.1996); *see also McKay v. Town and Country Cadillac, Inc.*, 991 F.Supp. 966, 969 & 970 (N.D.Ill.1997) (holding that a plaintiff may allege factual conclusions that he or she is disabled, as long as the pleadings provide notice of the claim, citing *Homeyer* and *Jackson v. Marion County*, 66 F.3d 151, 154 (7th Cir.1995)). This fairly liberal standard must be contrasted with that recently espoused by the district court in *Parisi v. Coca–Cola Bottling Co. of N.Y.*, 995 F.Supp. 298 (E.D.N.Y.1998), in which the court held that "[t]o allege a disability under the first definition of that term [in § 12102(2), an impairment that substantially limits one or more major life activities], a plaintiff must allege a factual basis that would support a finding of 'substantial limitation of a major life activity,' and may not rely upon conclusory allegations of such a limitation." *Parisi*, 995 F.Supp. at 301; *see also Saunders v. Horn*, 959 F.Supp. 689, 697 (E.D.Pa.1996) (holding that it was sufficient to allege disability for the plaintiff to allege activities in which he could not engage to allege that he suffered limitations in one or more major life activity); *Cerrato v. Durham*, 941 F.Supp. 388, 393 (S.D.N.Y.1996) (it is sufficient to allege disability to allege facts of the plaintiff's condition showing that the plaintiff is substantially impaired in a major life activity). Yet another district court considers whether the plaintiff has alleged that the plaintiff's condition is a physical or mental impairment, whether that impairment af-

fects a major life activity, and whether the major life activity is substantially limited by the impairment. *Patterson v. Xerox Corp.,* 901 F.Supp. 274, 277 (N.D.Ill.1995).

■ I & M relies on *Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990), for the proposition that the Track Workers cannot simply plead the legal conclusion that they are disabled within the meaning of the ADA. This is true, so far as it goes, because *Westcott* does hold that, on a motion to dismiss pursuant to Rule 12(b)(6), the court "do[es] not . . . blindly accept the legal conclusions drawn by the pleader from the facts." Furthermore, in *Silver v. H & R Block, Inc.,* 105 F.3d 394, 397 (8th Cir.1997), the Eighth Circuit Court of Appeals held that, on such a motion, a court must "reject conclusory allegations of law and unwarranted inferences." These decisions are particularly instructive, because this court suspects that some of the confusion among the courts about the manner in which "disability" within the meaning of the ADA must be pleaded arises from the fact that "disability" is *a legal conclusion drawn from facts,* not a purely "legal" or "factual" conclusion. Thus, it is *not* sufficient for a plaintiff to plead simply that he or she was "disabled within the meaning of the ADA," without also pleading some factual basis from which inferences supporting this legal conclusion can be drawn. *Silver,* 105 F.3d at 397; *Westcott,* 901 F.2d at 1488. Although *Homeyer,* 91 F.3d at 961, appears to hold contrary to this conclusion, the pleadings in that case did indeed identify the plaintiff's alleged impairment and that the impairment substantially limited her ability to breathe, a major life activity, and thus gave sufficient notice of her disability claim.

■ The Track Workers' pleading of "disability" here does not go even the short distance required by *Homeyer* and fails to go the full distance required by *Silver* or *Westcott.* The court has perused the amended complaint in vain for any allegation of a specific impairment suffered by any Track Worker (a permissible factual conclusion), let alone any factual allegation that would support an inference that any Track Worker was substantially limited by any impairment in any major life activity. The complaint instead alleges that the Track Workers' injury

and disability histories were disclosed to I & M or were the subject of interview questions by I & M and that, on the basis of these records or the answers to these inquiries, I & M refused the Track Workers employment. From the pleadings, it would be an "unwarranted inference" to leap to the conclusion that the Track Workers suffered some impairment that substantially limited a major life activity as required by the first definition of disability in § 12102(2). *See Silver,* 105 F.3d at 397.

However, the Track Workers' allegations may be sufficient to allege perceived disability. *See Cerrato,* 941 F.Supp. at 394 (concluding that allegations insufficient to allege disability might nonetheless be sufficient to allege perceived disability where they indicated the employer's response to the plaintiff's condition). Because perceived disability claims turn on the employers' subjective response to an employee's apparent impairment, *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995), it is not an "unwarranted inference," *Silver,* 105 F.3d at 397, to leap from allegations that I & M had information concerning the Track Workers' workers' compensation and disability claims and declined to hire the Track Workers based on that information to the conclusion that I & M perceived the Track Workers to be disabled and refused to hire them on that account.

The Track Workers have specifically offered, in their resistance brief and again at oral arguments, to replead their disability discrimination claim, if the court deems it necessary, although they assert that discovery responses that they will soon provide to I & M will adequately support the factual basis for their claims. The court concludes that repleading of any claims based on "disability" is required, while repleading of claims based on perceived disability is at least advisable. Therefore, the court will grant I & M's motion to dismiss the Track Workers' ADA claim to the extent that it will require the Track Workers to replead adequately that the plaintiffs are disabled or perceived to be disabled by identifying each plaintiff's specific impairment or injury and the major life activity that impairment or injury substantially limits or was perceived to limit.

### E. Civil Conspiracy

Finally, Soo Line has moved to dismiss the Track Workers' sixth cause of action, which asserts a claim pursuant to Iowa law of a civil conspiracy to violate the Track Workers' rights under the RLA, FELA, FRA, ADA, and ADEA. Soo Line contends that this civil conspiracy claim must be dismissed, because of the lack of any underlying violation of either the RLA or the FELA, and because the comprehensive remedial schemes of the ADA and ADEA make any conspiracy cause of action untenable. The Track Workers respond that they have adequately alleged that the defendants acted in concert to accomplish an unlawful end or to accomplish a lawful end through unlawful means. They assert that a civil conspiracy claim here will not circumvent the administrative regimes of either the ADA or the ADEA, because the administrative processes for these claims have already been exhausted.

#### 1. Civil conspiracy under Iowa law

A recognized aspect of Iowa law is the legal theory of civil liability for conspiracy to commit a wrongful act. *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 232–33 (Iowa 1977); *Cora v. Strock*, 441 N.W.2d 392, 394 (Iowa Ct.App.1989). However, the Iowa Supreme Court has repeatedly "recognized that '[c]ivil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy which give rise to the action.'" *Robert's River Rides, Inc. v. Steamboat Dev. Corp.*, 520 N.W.2d 294, 302 (Iowa 1994) (quoting *Basic Chems., Inc.*, 251 N.W.2d at 233, and *Lindaman v. Bode*, 478 N.W.2d 312, 317 (Iowa Ct.App.1991)). The Iowa Supreme Court explained the nature of civil conspiracy in *Basic Chemicals* as follows:

> A conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful. It may be proven by substantial evidence.

*Basic Chems., Inc.*, 251 N.W.2d at 232; *accord Cora*, 441 N.W.2d at 394 (quoting *Basic Chemicals*). To put it another way, civil conspiracy requires "mutual mental action coupled with an intent to commit the act which results in injury." *Basic Chems., Inc.*,

251 N.W.2d at 233. Thus, "[t]he principal element of conspiracy is an agreement or understanding between two or more persons to effect a wrong against or injury upon another." *Id.; accord Locksley v. Anesthesiologists of Cedar Rapids, P.C.*, 333 N.W.2d 451, 456 (Iowa 1983). However, "unless actual damage has resulted from something done by one or more of the conspirators in furtherance of the object of the conspiracy, no civil action lies against anyone." *Southern New York Ry., Inc. v. Fort Dodge, Des Moines & Southern Ry. Co.*, 316 N.W.2d 840, 844 (Iowa 1982) (citing *Basic Chems., Inc.*, 251 N.W.2d at 233). Therefore, in *Southern New York Ry., Inc.*, a conspiracy claim failed for the following reasons:

> There is no evidence that C & NW directors, or any combination of defendants, entered into any concerted action to accomplish an unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful; there is no evidence that any allegedly conspiratorial act resulted in injury to plaintiffs, or that plaintiffs have sustained damages as a result of such acts allegedly done by any defendant. Nor does the evidence support the charge that the bondholders' security has been impaired.

*Id.*

The Eighth Circuit Court of Appeals has articulated identical principles for a civil conspiracy claim:

> To establish a civil conspiracy, plaintiffs must show five elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy. *See, e.g., State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 811 P.2d 1220, 1226 (1991); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). Without evidence of specific facts tending to show an agreement or a "meeting of the minds" and concerted action, a plaintiff seeking to show a civil conspiracy cannot survive a defendant's summary judgment motion. *See, e.g., Anderson v. Douglas County*, 4 F.3d 574, 578 (8th Cir.1993),

**940**

*cert. denied,* 510 U.S. 1113, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); *Mike Pratt & Sons, Inc. v. Metalcraft, Inc.,* 222 Neb. 333, 383 N.W.2d 758, 763 (1986) (stating that plaintiff must prove existence of agreement between two or more persons to inflict an injury upon or wrong against another).

*In re Temporomandibular Joint (TMJ) Implants Prods. Liability Lit.,* 113 F.3d 1484, 1498 (8th Cir.1997).

Similarly, in a case applying Minnesota law, the Eighth Circuit Court of Appeals explained the principles of civil conspiracy as follows:

> Under Minnesota law conspiracy is based on the commission of an underlying tort: [S]ince in so-called civil conspiracy cases liability is predicated upon the tort committed by the conspirators and not upon the conspiracy, allegation[s] of conspiracy do not change the nature of the cause of action.

*Harding v. Ohio Casualty Insurance Co.,* 230 Minn. 327, 41 N.W.2d 818, 825 (1950). Thus, "the gist of the action is not the conspiracy charged, but the tort working the damage to the plaintiff." *Id.,* 41 N.W.2d at 824 (citations omitted). *The Minnesota court concluded that "[a]ccurately speaking, there is no such thing as a civil action for conspiracy," and "there can be no recovery unless substantive wrongs are pleaded." Id. The true purpose of conspiracy is "to show facts for vicarious liability of defendants for acts committed by others, joinder of joint tortfeasors, and aggravation of damages." Id.* *Gaming Corp. of Am. v. Dorsey & Whitney,* 88 F.3d 536, 551 (8th Cir.1996) (emphasis added); *Gallinger v. North Star Hosp. Mut. Assur., Ltd.,* 64 F.3d 422, 429 (8th Cir.1995) (under Minnesota law, "[a] civil conspiracy claim cannot survive independent of the [substantive] causes of action," which in that case had already been dismissed).

Thus, it is clear that a civil conspiracy claim cannot survive unless the plaintiff or plaintiffs have alleged a violation of the substantive law upon which the conspiracy claim is based. *See Robert's River Rides, Inc.,* 520 N.W.2d at 302; *Basic Chems., Inc.,* 251 N.W.2d at 233; *Lindaman,* 478 N.W.2d at

317; *accord Gaming Corp. of Am.,* 88 F.3d at 551 (applying Minnesota law); *Gallinger,* 64 F.3d at 429 (same). However, the Railroads' first argument for dismissal of the Track Workers' civil conspiracy claim, that the Track Workers have failed to allege substantive violations of the federal laws upon which their conspiracy claims are based, must fail. For the reasons discussed above, the Track Workers *have* alleged substantive causes of action against the Railroads under the FELA and the ADA, and the court finds, they have also alleged a substantive violation of the ADEA that is unchallenged as of yet. The exception, of course, is the allegation of conspiracy to violate the RLA, because—as explained above—the Eighth Circuit Court of Appeals has held that "[f]ederal courts have no jurisdiction to review claims of a conspiracy to violate either a labor contract or federal labor law such as the Railway Labor Act." *Brotherhood of Ry. Carmen,* 944 F.2d at 1430. Therefore, the Track Workers' civil conspiracy claim cannot be defeated on the basis of the lack of allegations of substantive violations of the FELA, ADA, or ADEA.

Furthermore, it is evident that the Track Workers have adequately alleged the other elements of a civil conspiracy claim. They have alleged that the two Railroads agreed or had a meeting of the minds to discriminate or retaliate against the Track Workers in making decisions about their reemployment with I & M in violation of the FELA, ADA, and ADEA; that the defendants exchanged information and made joint decisions to that end; and that the Track Workers were denied employment with I & M, and thereby injured, as a proximate cause of the concerted actions of the Railroads. *See Basic Chems., Inc.,* 251 N.W.2d at 232 (defining a civil conspiracy as "a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful," or as "mutual mental action coupled with an intent to commit the act which results in injury," and noting that the "principal element" of such a claim is "an agreement or understanding between two or more persons to effect a wrong against or injury upon another"); *accord Temporomandibular Joint (TMJ) Implant Recipients,* 113 F.3d at

1498 (listing elements of a civil conspiracy claim); *Reese v. Teamsters Local Union No. 541*, 993 F.Supp. 1376, 1379 (D.Kan.1998) (although the plaintiff withdrew his ADA conspiracy claim the court found that he had adequately pleaded a Title VII conspiracy claim, because "[a] complaint which alleges the manner in which a conspiracy is to be carried out and the role of the defendants in the conspiracy is sufficient to withstand a motion to dismiss."). Soo Line, however, mounts other challenges to the Track Workers' civil conspiracy claim.

### 2. Can a state-law civil conspiracy claim be based on an alleged violation of federal law?

■■■ In *Gaming Corporation*, the Eighth Circuit Court of Appeals countenanced a state-law civil conspiracy claim based on violations of *federal* law, but found that such a cause of action was nonetheless one arising under federal law:

> The conspiracy claim here arises under federal law for purposes of jurisdiction since federal law is the only measure of whether Dorsey and the [Ho–Chunk] nation conspired to commit an unlawful act or to commit a lawful act in an unlawful manner. *See Harding*, 41 N.W.2d at 824. The Indian Civil Rights Act, 25 U.S.C. § 1302, is the sole basis for the conspiracy alleged in amended count IX, so provisions of that law are the substantive measures to be employed.... *Furthermore, if state law conspiracy (or aiding and abetting) claims based solely on violation of federal law were said to arise under state law, litigants could both avoid federal question jurisdiction and create causes of action where Congress intended there to be none.*

*Gaming Corp.*, 88 F.3d at 551 (emphasis added). Thus, the FELA, ADA, and ADEA are the "substantive measures to be employed" in determining whether the Track Workers have adequately alleged civil conspiracy claims, as these statutes are "the sole basis for the conspiracy alleged in" the Track Workers' amended complaint. *Id.*

The Eleventh Circuit Court of Appeals took up a similar theme in affirming summary judgment in favor of some of the defendants on a claim of civil conspiracy to violate the ADA in *Cramer v. Florida*, 117 F.3d 1258 (11th Cir.1997). The plaintiffs had alleged a conspiracy to violate the ADA by certain employers, the employers' insurers and insurance servicing agents, and certain state defendants. *Cramer*, 117 F.3d at 1263. However, the Eleventh Circuit Court of Appeals rejected a conspiracy claim against the employers' insurers and insurance servicing agents and the state defendants, because "appellants' attorneys have cited no authority which holds, or even hints at the possibility, that these appellees could be held liable under the ADA." *Id.* at 1264. Instead, the court found that the ADA provided for a cause of action only against "covered entities," identified in the statute as "an employer, employment agency, labor organization or joint labor-management committee." *Id.* at 1264 n. 15 (quoting 42 U.S.C. § 12111(2)). Here, the court has concluded above that both I & M and Soo Line are proper defendants on the substantive FELA claim. As employers or prospective employers, both I & M and Soo Line are appropriate defendants on a substantive ADA or ADEA claim as well. *See* 42 U.S.C. § 12111(2); 29 U.S.C. § 623(b).

As *Gaming Corporation* suggests, however, another question that must be answered is whether the Track Workers are asserting conspiracy claims where "Congress intended there to be none." *Gaming Corp.*, 88 F.3d at 551. Soo Line urges that an additional cause of action for conspiracy for alleged violations of the ADA and ADEA would allow wholesale circumvention of the comprehensive administrative procedures and remedial schemes created by Congress in those statutes, citing *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Soo Line argues that the rationale of *Novotny*, which considered a conspiracy claim pursuant to 42 U.S.C. § 1985(3), applies just as strongly to a state-law civil conspiracy claim. The Track Workers reject the analogy between § 1985(3) and state-law civil conspiracy claims, because they contend that a civil conspiracy claim is broader than a § 1985(3) claim, and they argue further that they have exhausted the administrative process on their substantive claims, so that circumvention of

administrative procedures, the concern in *Novotny*, is not an issue here.

In *Novotny*, the Supreme Court "conclude[d] that § 1985(3) may not be invoked to redress violations of Title VII." *Novotny*, 442 U.S. at 378, 99 S.Ct. 2345. The Court first detailed the history of § 1985(3), noting that this section "provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Id.* The Court noted that, in *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), it had

> discerned the following criteria for measuring whether a complaint states a cause of action under § 1985(3):
>
> "To come within the legislation a complaint must allege that the defendants did (1) 'conspire or go in disguise on the highway or on the premises of another' (2) 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.' It must then assert that one or more of the conspirators (3) did, or caused to be done, 'any act in furtherance of the object of [the] conspiracy,' whereby another was (4a) 'injured in his person or property' or (4b) 'deprived of having and exercising any right or privilege of a citizen of the United States.' " 403 U.S. at 102–103, 91 S.Ct. 1790.

*Novotny*, 442 U.S. at 372, 99 S.Ct. 2345. The Court then examined the "detailed administrative and judicial process designated to provide an opportunity for nonjudicial and nonadversary resolution of claims" under Title VII. *Id.* at 372–73, 99 S.Ct. 2345. In rejecting a conspiracy cause of action pursuant to § 1985(3), the Court reasoned as follows:

> If a violation of Title VII could be asserted through § 1985(3), a complainant could avoid most if not all of these detailed and specific provisions of the law. Section 1985(3) expressly authorizes compensatory damages; punitive damages might well follow. The plaintiff or defendant might demand a jury trial. The short and precise time limitations of Title VII would be grossly altered. Perhaps most importantly, the complainant could completely by-

pass the administrative process, which plays such a crucial role in the scheme established by Congress in Title VII.

*Id.* at 375–76, 99 S.Ct. 2345. Finally, the court observed that

> [i]t is true that a § 985(3) remedy would not be coextensive with Title VII, since a plaintiff in an action under § 1985(3) must prove both a conspiracy and a group animus that Title VII does not require. While this incomplete congruity would limit the damage that would be done to Title VII, it would not eliminate it. Unimpaired effectiveness can be given to the plan put together by Congress in Title VII only by holding that deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3).

*Id.* at 378, 99 S.Ct. 2345; *see also Foster v. Wyrick*, 823 F.2d 218, 221–22 (8th Cir.1987) (discussing *Novotny*'s rationale and finding that *Novotny* applied to Title VII disparate impact claims as well as Title VII retaliation claims).

Although *Novotny* involved the question of the availability of a conspiracy cause of action for violation of Title VII pursuant to § 1985(3), the Track Workers' attempts to distinguish it for their state-law conspiracy claim are unavailing. First, the court cannot find that the *Novotny* decision was based on "the peculiar language of 1985(3) (i.e., "conspire or go in disguise on the highway" etc.)," as the Track Workers contend. Joint Brief of Plaintiffs Opposing Motions To Dismiss, p. 22. As this court reads *Novotny*, the "peculiar language" of § 1985(3) was in no way determinative of the Court's decision. Rather, the sole basis on which the Court relied was that a conspiracy claim pursuant to § 1985(3) would disturb the administrative and remedial scheme established by Congress in Title VII. *See Novotny*, 442 U.S. at 375–76, 99 S.Ct. 2345.

Furthermore, the Track Workers' attempt to distinguish *Novotny* on the ground that they have exhausted the administrative process for their substantive claims, thus relieving the court of the concerns that troubled the court in *Novotny*, runs afoul of the facts in the *Novotny* case itself: In *Novotny*, "Novotny filed a complaint with the Equal Em-

ployment Opportunity Commission under Title VII of the Civil Rights Act of 1964[and][a]fter receiving a right-to-sue letter, he brought this lawsuit ... in the District Court for the Western District of Pennsylvania." *Id.* at 369, 99 S.Ct. 2345. Thus, the Court's conclusion in *Novotny* that a conspiracy cause of action pursuant to § 1985(3) for violation of Title VII was not available was reached in the very same context presented here, one in which the plaintiff had obtained a "right-to-sue" letter, and thus that rationale of *Novotny* applies whether or not the plaintiff has already exhausted the administrative process the Court was seeking to protect. *But see Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 576 (2d Cir.1989) (where the plaintiff added his Title VII cause of action to a complaint asserting claims pursuant to § 1983, not a conspiracy claim pursuant to § 1985(3) asserting a conspiracy to violate Title VII, only after receiving a "right-to-sue" letter, "the concern in *Novotny*—that allowing a concurrent § 1985 claim based on violations of Title VII would thwart the administrative requirements of the latter's remedial scheme—is not present here").

A very few decisions have considered the applicability of *Novotny* to claims of conspiracy to violate the ADA or the ADEA.[12] Although it is unclear whether a claim of conspiracy to violate the ADEA was brought pursuant to § 1985(3) or state common law in *Jones v. Baskin, Flaherty, Elliot and Mannino, P.C.*, 738 F.Supp. 937 (W.D.Pa.1989), *aff'd*, 897 F.2d 522 (3d Cir.) (table op.), *cert. denied*, 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990), the court relied on *Novotny* to conclude that the conspiracy claim was unavailable. The court reasoned that the logic of *Novotny* applied to the ADEA, because that statute, like Title VII, employed a de-

tailed administrative and remedial scheme. *Jones*, 738 F.Supp. at 940–41; *see also Golden v. Shapell Indus.*, 24 Fair Empl. Prac. Cas. (BNA) 1283, 1285 (N.D.Cal.1980) (also applying *Novotny*'s rationale to reject a conspiracy claim pursuant to § 1985(3) alleging conspiracy to violate the ADEA); *Moorhouse v. Boeing Co.*, 501 F.Supp. 390, 394 (E.D.Pa. 1980), *aff'd*, 639 F.2d 774 (3d Cir.1981) (table op.); *Davis v. Southeastern Community College*, 424 F.Supp. 1341 (1976), *vacated in part on other grounds*, 574 F.2d 1158 (1978). One court, without reference to *Novotny*, rejected a civil conspiracy claim on other grounds. *See White v. Lincoln Plating Co.*, 955 F.Supp. 98, 101 (D.Colo.1997) (considering whether plaintiffs could state a state-law civil conspiracy claim for conspiracy to violate the ADEA, noting that the ADEA "contains no provisions concerning conspiracies," but rejecting such a claim against the defendants in that case, because they were employees of a corporation who acted on behalf of the corporation, and thus could not be the necessary "two or more persons" required for a conspiracy).

This court agrees that the rationale of *Novotny* applies to a state-law civil conspiracy claim alleging conspiracy to violate the ADA or the ADEA, because each of these statutes employs a detailed administrative and remedial scheme, *see, e.g.*, 29 U.S.C. § 626 (ADEA administrative scheme); 42 U.S.C. § 12117 (ADA administrative scheme, which "borrows" that of Title VII), and to allow a common-law action that might evade this scheme is not what Congress intended. *See Gaming Corp.*, 88 F.3d at 551 (considering whether plaintiffs are asserting conspiracy claims where "Congress intended there to be none.").

**12.** Soo Line relies upon the unpublished decision of the United States District Court for the Eastern District of Pennsylvania in *Seiple v. Community Hosp. of Lancaster*, 1998 WL 175593 (E.D.Pa.1998) (unpublished), for the proposition that *Novotny* applies to state-law conspiracy claims as well as § 1985(3) conspiracy claims for conspiracy to violate the ADEA and the ADA. *Seiple* in turn relies on *Lake v. Arnold*, 112 F.3d 682, 688 n. 10 (3d Cir.1997). In *Lake*, however, the Third Circuit Court of Appeals did not "acknowledg[e][the] applicability of *Novotny* to claims of conspiracy to violate

the ADA," as the court in *Seiple* states. *Seiple*, 1998 WL 175593 at *4. Rather, the court stated that its "reference to the ADA for the purpose of defining the context of 'class' under § 1985(3) does not ... conflict with the Supreme Court's analysis in *Novotny*." *Lake*, 112 F.3d at 688 n. 10. "The procreation right which Lake asserts has its source *not* in the ADA but in the Constitution itself. Our reference to the ADA for the purpose of evaluating whether or not the handicapped have been subjected to invidious discrimination in no way eviscerates the ADA." *Id.*

However, the FELA does not employ such a remedial scheme. Instead, it authorizes actions for injuries to be brought in the state or federal district courts. *See* 45 U.S.C. § 56. Thus, the rationale of *Novotny* is inapplicable to the Track Workers' FELA conspiracy claim brought pursuant to state law. Soo Line has offered no other basis on which to reject such a claim beyond the assertion of the lack of allegations of a substantive violation,[13] which were rejected in the discussion of the substantive FELA claim. The court finds the elements of such a FELA conspiracy claim have been adequately alleged, as noted above. Thus, the Track Workers' conspiracy count survives Soo Line's motion to dismiss only as to the portion of that claim asserting a conspiracy to violate the FELA.

## III. CONCLUSION

The court concludes that the Railroads' motions to dismiss must be granted in part, but otherwise denied. The motions to dismiss the Track Workers' claim pursuant to the RLA must be denied, because the Track Workers have alleged that they were "transfer employees," *Pyles*, 79 F.3d at 1051–52, that Soo Line alone has violated the RLA, and that there was a predecessor-successor relationship between Soo Line and I & M, which would allow the Track Workers to assert their RLA claim against either entity. Next, although the court will leave open for now the question of whether Iowa public policy authorizes a claim for retaliation for filing FELA claims, the court concludes that the FELA itself authorizes a claim for retaliation against the claimant, not just witnesses, pursuant to 45 U.S.C. § 60, and that such a claim by applicants will lie against a prospective employer, as well as against the applicants' then-current employer. However, the Railroads are entitled to partial dismissal of the FELA retaliation claim as to the prayer for compensatory damages, because such a claim is authorized only for equitable and injunctive relief. Therefore, that portion of the Railroads' motions to dismiss challenging

the Track Workers' FELA claim must granted only in part, but otherwise denied.

I & M's motion to dismiss the Track Workers' ADA claim fares better. The court concludes that the Track Workers, as applicants for employment with I & M within the meaning of the ADA, can state a claim of *"per se"* violation of § 12112(d)(2) of the ADA for prohibited inquiries *only if* they can also state a claim that they are disabled within the meaning of the ADA, but that they have not adequately pleaded disability within the meaning of the ADA, and their pleading of perceived disability is sufficiently weak that repleading of such a claim is advisable. The same inadequacy of pleading of disability or perceived disability requires dismissal of any ADA claim of discriminatory failure to hire by I & M. However, the Track Workers will be given time within which to replead adequately that the plaintiffs are disabled or perceived to be disabled by identifying each plaintiff's specific impairment or injury and the major life activity that impairment or injury substantially limits or was perceived to limit.

Finally, the court finds that the Railroads are entitled to dismissal of substantial portions of the Track Workers' civil conspiracy claim. First, it is the law of this circuit that federal courts have no jurisdiction to review claims of a conspiracy to violate the RLA. Furthermore, a state-law civil conspiracy claim alleging conspiracy to violate the ADA or the ADEA is barred, because each of these statutes employs a detailed administrative and remedial scheme, and to allow a common-law action that might evade this scheme is not what Congress intended. However, this rationale is not applicable to a claim of conspiracy to violate the FELA, and such a claim is adequately alleged here. Thus, the Track Workers' conspiracy count survives Soo Line's motion to dismiss only as to the portion of that claim asserting a conspiracy to violate the FELA. Although I & M did not specifically move to dismiss the Track Workers' civil conspiracy claim, the court concludes that there is an "insuperable bar"

---

13. Soo Line's argument that a conspiracy claim pursuant to § 1985(3) cannot lie where the class is defined on economic terms, as Soo Line contends the class would be on a FELA conspiracy

claim, is mooted by the Track Workers' withdrawal of their § 1985(3) claim. Class-based animus is not an essential element of a state-law conspiracy claim.

to portions of this claim, as asserted by Soo Line, such that the same portions of the claim cannot be asserted against I & M as a matter of law.

THEREFORE,

1. I & M's April 9, 1998, motion to dismiss is

a. **denied** as to the Track Workers' RLA claim;

b. **granted** as to the Track Workers' prayer for compensatory damages on their FELA claim, but otherwise denied as to the FELA claim;

c. **granted** as to the Track Workers' ADA claim to the extent that the Track Workers shall have **forty-five (45) days** from the date of this order within which to replead adequately that the plaintiffs are disabled or perceived to be disabled by identifying each plaintiff's specific impairment or injury and the major life activity that impairment or injury substantially limits or was perceived to limit;

d. **granted** as to the Track Workers' civil conspiracy claim, **except** as to the Track Workers' allegations of a conspiracy to violate the FELA; and

e. **denied as moot** as to the conspiracy claim pursuant to 42 U.S.C. § 1985(3) upon withdrawal of that claim by the plaintiffs.

2. Soo Line's May 13, 1998, motion for judgment on the pleadings and to dismiss for lack of subject matter jurisdiction is

a. **denied** as to the Track Workers' RLA claim;

b. **granted** as to the Track Workers' prayer for compensatory damages on their FELA claim, but otherwise denied as to the FELA claim;

c. **granted** as to the Track Workers' civil conspiracy claim, except as to the Track Workers' allegations of a conspiracy to violate the FELA; and

d. **denied as moot** as to the conspiracy claim pursuant to 42 U.S.C. § 1985(3)

upon withdrawal of that claim by the plaintiffs.

**IT IS SO ORDERED.**